[Crim. No. 5722. In Bank. July 8, 1955.]

THE PEOPLE, Respondent, v. MARY PENNY, Appellant.

D. Brandon Bernstein and Robert P. Dockeray for Appellant.

Edmund G. Brown, Attorney General, Norman H. Sokolow and William E. James, Deputy Attorneys General, for Respondent.

CARTER, J.—Appeal by defendant Mary Penny from a judgment of conviction of involuntary manslaughter.

Defendant was charged with a violation of section 192, subdivision 2, of the Penal Code. That section provides that manslaughter is the unlawful killing of a human being, without malice. ''2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle.''

For seven years defendant had been engaged in ''face rejuvenation'' in the city of Los Angeles. It is conceded

that she had no license from either the Cosmetology Board or the Medical Board of this state; she did have a business license from the city of Los Angeles for the business of ''Face Rejuvenation.''

Defendant had a year's training with a Madame Bergeron (now deceased) in Los Angeles and approximately three months' training with one Geraldine Gorman in New York. In New York, she received the formula which she used in her work. The formula consisted of one ounce of water, a heaping tablespoon of resorcinol (of the same chemical group) and 16 drops of phenol (carbolic acid).

Kay Stanley, the victim, had consulted with defendant some seven months earlier about having her face treated to remove wrinkles and pock marks, but did not have the money to do it at that time. Around Easter time of 1953, she again asked defendant to treat her face, but defendant was to be away and could not do it then. On the morning of May 4, 1953, Kay Stanley arrived at about 10 in the morning at defendant's home where she was to stay during the treatment. Kay's face was first washed with warm water and soda; the formula was then applied with a cotton wrapped wooden applicator to Kay's cheeks, a square inch at a time. After each application, the area was pressed with sterile gauze to remove excess moisture. The entire forehead was covered as well as the eyelids, the process taking about two hours. The treated area was then covered with gauze and taped with small pieces of tape which overlapped and covered the area; regular waterproof adhesive tape was then put on over the other tape; this formed a mask over the upper portion of the patient's face. After the taping had been completed, Kay walked to an adjoining room where she had lunch, listened to the radio and looked at magazines. At approximately 6 in the evening, defendant proceeded to treat the lower half of Kay's face in the same manner as she had treated the upper portion which took about three quarters of an hour. When the treatment was completed, Kay asked defendant if she could sit up for awhile before the taping was started; she sounded sleepy. The defendant told her she could and said she would get her a glass of water. When defendant returned with the water, Kay said, ''I feel a little bit faint'' and lay back as though in a faint. Defendant asked her how she felt but received no answer. When defendant tried to lift her she found she was dead weight and felt that she had fainted. Defendant tried unsuccessfully to call a Dr. Wallace

and left a message for him; she then called a nurse-anaesthetist who arrived at the house about 10 or 15 minutes later. Mrs. Jevne, the nurse, tried to take the patient's pulse without success; there was no respiration. She then administered Coramine, a heart stimulant by hypodermic needle, in the arm; she then gave a hypodermic injection of Metrazol, another stimulant; she then tried artificial respiration and caffeine benzoate. She told defendant to call the doctor again. Dr. Wallace arrived about an hour after Mrs. Jevne did and examined the lady whom he found lying on the treatment table. He was able to feel no pulse and there was no respiration. He noticed signs indicating death had existed for some period of time.

Defendant called her attorney who called the police.

The finding, after an autopsy had been had, was that the immediate cause of death was phenol (carbolic acid) poisoning and edema of the glottis due to "application of phenol-containing mixture to the face and neck." Other findings were that 5.1 milligrams of phenol per 100 grams were found in the liver and 2.9 milligrams of phenol per 100 grams were found in the blood of the victim. It was the opinion of Dr. Newbarr, prosecution witness and chief autopsy surgeon for the Los Angeles coroner's office, that these findings were the result of the application of a solution containing more than 10 per cent phenol to the face and neck of the victim. It was the opinion of Mr. Abernathy, the toxicologist, that the reddish-brown discoloration of the victim's face was a third degree burn caused by phenol, and that the normal finding of phenol in a normal human being would be practically zero.

There was evidence in the record which showed that the victim had been taking reducing pills prescribed by a Texas doctor; that in order to obtain replacement of the pills, it was necessary for her to have her heart examined and blood pressure taken by a local doctor; that prior to going to the defendant's home for the face rejuvenation treatment she had had her heart and pulse examined and her blood pressure taken and that all findings were normal.

The defendant testified that when she first received the formula for face rejuvenation she had it analyzed and that it contained only 3.1 per cent phenol. The defense also took the position that the victim may have had an allergy to phenol which was the cause of death. Dr. Newbarr testified for the prosecution and gave, as his opinion, that the solution

contained over 10 per cent phenol and that the findings were not consistent with the theory of allergy. Dr. Johnstone testified for the defense and it was his opinion that the solution contained approximately 3 per cent phenol; that when applied to the skin it would not cause death; that all autopsy findings were consistent with the theory that the victim was allergic to phenol. Without going into great detail, it seems sufficient to note that the medical testimony was in direct conflict. Defendant's argument that the evidence is insufficient to support the judgment insofar as the cause of death is concerned is without merit. The testimony is ample to show that the victim died of phenol poisoning.

■ Defendant's argument that Dr. Newbarr was "allowed" to give an "unsupported and incompetent opinion" that the solution contained more than 10 per cent phenol is also without merit. Dr. Newbarr was found to be qualified by the trial court; his opinion was based on his reading on the subject, his own observation of the victim, and his own previous experiences. ■ The qualifications of an expert witness are for the trial court (*People* v. *Pacific Gas & Elec. Co.*, 27 Cal.App.2d 725 [81 P.2d 584]) and any question as to the degree of his knowledge goes to the weight of his testimony rather than as to its admissibility. (*Howland* v. *Oakland C. St. Ry. Co.*, 110 Cal. 513 [42 P. 983]; *Pfingsten* v. *Westenhaver*, 39 Cal.2d 12 [244 P.2d 395]; *Estate of Johnson*, 100 Cal.App.2d 73 [223 P.2d 105].) ■ Defendant's argument that the testimony of her witness, Dr. Johnstone, was uncontradicted is also without merit. Dr. Johnstone's testimony merely created a conflict in the evidence and it was the function of the trier of fact to resolve that conflict.

### INSTRUCTIONS

Defendant contends that the following instruction was without basis in the evidence. "Any *licensed* cosmetologist who applies to any human being a solution of phenol greater than ten per cent is guilty of a misdemeanor.

"This is an unlawful act not amounting to a felony. Business & Professions Code, Section 7415." (Emphasis added.)

As heretofore pointed out, it is admitted that defendant was not licensed as a cosmetologist.

It is contended that the just quoted instruction was calculated to mislead and confuse the jury when considered with the following instruction: "Every person who engages in, or attempts to engage in, the practice of cosmetology or any branch thereof without a license therefore issued by the

State Board of Cosmetology or in an establishment other than one licensed by the State Board of Cosmetology is guilty of a misdemeanor.

"The art of cosmetology includes the beautifying of the face, neck, arms, bust or upper part of the human body, by the use of cosmetic preparations, antiseptics, tonics, lotions or creams.

"A violation of this law is an unlawful act not amounting to a felony.

"Business & Professions Code, Section 7325

"Business & Professions Code, Section 7321(b) [sic] [c]."

It is argued that under these two instructions defendant could have been convicted (1) if the jury believed she used a solution containing more than 10 per cent phenol and had a license; or (2) that she was guilty because she was required to have a license and had none.

There can be no doubt but that the instruction concerning a "licensed" cosmetologist was erroneous and that it had no foundation in the evidence. On the issue of defendant's guilt, the jury could well have inferred that she was guilty of the crime by reasoning that *even* a licensed cosmetologist could not use a solution containing more than 10 per cent phenol. So far as the second instruction is concerned, it is supported by the evidence and correctly stated the law as it relates to those practicing cosmetology and the persons considered engaged in that practice. It appears to us that as a matter of law, defendant was engaged in the practice of cosmetology and the jury should have been so instructed.

We said in *People* v. *Thomas,* 25 Cal.2d 880, 897 [156 P.2d 7], that the responsibility of statutory construction should not be left to the jury; that the interpretation of a statute and the question of its applicability to any given set of facts are exclusively the province of the court.

The next question which presents itself is whether defendant's lack of a license (and the fact that she was, therefore, guilty of a misdemeanor) was the cause of Mrs. Stanley's death. Section 192.2 of the Penal Code provides that a person is guilty of involuntary manslaughter if a human being is unlawfully killed "in the commission of an unlawful act, not amounting to a felony; . . ." The jury was instructed that defendant's conduct must have been the proximate cause of the death. The People argue that the law requiring licensing of those practicing cosmetology was

designed to prevent injury to others and that one who violates such a law may be guilty of manslaughter if death is caused thereby, citing *People* v. *Mitchell,* 27 Cal.2d 678, 683 [166 P.2d 10]. The Mitchell case involved section 500 of the Vehicle Code which provided "When the death of any person ensues within one year as the *proximate result* of injuries caused by the driving of any vehicle with reckless disregard. . . . " and is not applicable here. Moreover, in the Mitchell case it was specifically noted that the provisions of the Penal Code (§ 192) defining involuntary manslaughter should not apply to homicide caused by the driving of any vehicle. In *People* v. *Kerrick,* 86 Cal.App. 542, 548 [261 P. 756], a case factually dissimilar to the one under consideration, the court said: "We cannot ignore the element of causation in the unlawful act necessary to connect it with the offense. In our ordinary phraseology we refer to the result of this element by saying it must be the probable consequence naturally flowing from the commission of the unlawful act." A causal connection was also held essential in *People* v. *Goodale,* 33 Cal.App.2d 80, 83 [91 P.2d 163]; *People* v. *Hurley,* 13 Cal. App.2d 208 [56 P.2d 978], and *People* v. *Freudenberg,* 121 Cal.App.2d 564 [263 P.2d 875]. It is extremely dubious that defendant's lack of a license had any causal connection with Mrs. Stanley's death and yet it should be noted that the statute (Bus. & Prof. Code, § 7415) provides that if a *licensed* cosmetologist uses a solution of phenol greater than 10 per cent on any human being, he, or she, is guilty of a misdemeanor. *Had* defendant been a licensed cosmetologist, under the evidence she would have been guilty of a misdemeanor, and, as a result, the first clause of section 192.2 of the Penal Code would have been directly applicable.

Another question which presents itself is whether defendant was guilty of an unlawful act in applying a solution containing phenol and resorcinol to the human face and neck with the knowledge that both chemicals were poisonous. The statute providing that a licensed cosmetologist may not use a solution containing greater than 10 per cent phenol without being guilty of a misdemeanor sets the standard for licensed persons in that profession or occupation. In discussing the violation of a criminal statute as a basis for a suit for civil damages, we said in *Clinkscales* v. *Carver,* 22 Cal.2d 72, 75 [136 P.2d 777], "When a legislative body has generalized a standard from the experience of the community and prohibits conduct that is likely to cause harm, the court

accepts the formulated standards and applies them [citations], except where they would serve to impose liability without fault." Is defendant, who was as a matter of law, practicing cosmetology, to be judged by the same standards as a *licensed* cosmetologist? The record shows that face rejuvenation, as practiced by defendant, was done to make the face look younger and fresher. The "art of cosmetology" is defined as that which beautifies the face, or neck, by the use of "cosmetic preparations, antiseptics, tonics, lotions or creams." It would appear that the legislative standard set for licensed cosmetologists in the interest of the public health and safety, could, conceivably, be considered applicable to defendant had the jury been so instructed.

### DUE CAUTION AND CIRCUMSPECTION

The second clause of section 192, subdivision 2, of the Penal Code provides that one is guilty of manslaughter if a human being is killed in the commission of a "lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. . . ." It has been held that without "due caution and circumspection" is the equivalent of "criminal negligence" (*People* v. *Driggs,* 111 Cal.App. 42 [295 P. 51] ; *People* v. *Hurley, supra,* 13 Cal.App.2d 208) and the jury was so instructed. However, the jury was also instructed that "Due caution and circumspection . . . mean such caution and circumspection as are reasonably appropriate to avoid injury to one's self and others, under the conditions at hand as they would be viewed by an ordinarily reasonable person in the same situation as the person whose conduct is in question. To exercise due care and circumspection is to take those proper precautions which a person of ordinary prudence would use in the same circumstances." Defendant contends this instruction was prejudicially erroneous in that it gave the jury the civil standard of negligence as a guide in a case where criminal negligence was involved.

If we assume that a treatment aimed at removing wrinkles from the human face is a "lawful act," it must next be determined whether such act was one which "might cause death." Defendant admitted she knew the substances used were poisons; that they were dangerous substances; that their indiscriminate use could be dangerous. Inasmuch as defendant was knowingly using poison in her treatment solution, the jury could have concluded that her treatment was one which could have caused death.

The jury was also instructed that "The doing of an act ordinarily lawful which results in the death of a human being may be manslaughter where the act, being one which might cause death, is performed in an unlawful manner or without due caution and circumspection. When a person is doing anything dangerous in itself or has charge of anything dangerous in its use and acts with reference thereto without taking those proper precautions which a person of ordinary prudence would have used under the circumstances and the death of another results therefrom, his act or neglect is a criminal act against the person so killed." The People contend that these two instructions harmonize with the case of *People* v. *Pociask,* 14 Cal.2d 679, 683-684 [96 P.2d 788]. The Pociask case involved a death resulting from a violation of section 500 of the Vehicle Code then in effect which referred to the driving of any vehicle in a "negligent manner." The court there said in answering the question of what constitutes criminal negligence, that the court is bound to apply an appropriate definition enacted by the Legislature and that section 500 of the Vehicle Code had made criminal the negligent driving of a vehicle which caused injuries to another proximately resulting in death within the time specified in the section.

While the last quoted instruction was substantially* that which was used in *People* v. *Wilson,* 193 Cal. 512 [226 P. 5] (an automobile case) and approved in the Pociask case, the court specifically noted that what might "amount to a lack of 'due caution and circumspection' in cases of involuntary manslaughter committed in the doing of a lawful act, or what may constitute the driving of a vehicle 'in a negligent manner,' are questions to be decided by the jury according to the particular facts in each case guided by appropriate instructions from the court."

Defendant relies on the rules set forth in *People* v. *Driggs, supra,* 111 Cal.App. 42, and *People* v. *Hurley, supra,* 13 Cal.App.2d 208, wherein the rule was said to be: "In order to constitute criminal negligence, there must enter into the act some measure of wantonness or flagrant or reckless disregard of the safety of others, or wilful indifference. If no one of these elements enters into the act, the person charged cannot be held guilty of criminal negligence." (*People* v.

---

*The following words were omitted from the instruction in the instant case: "even though his negligence does not amount to a wanton or reckless disregard of human safety or life."

*Driggs,* at page 47.) As we read the Pociask case which approved the instruction given in *People* v. *Wilson, supra,* 193 Cal. 512, which was almost* the same as that here given, wherein it is said (p. 84), "Anything in the Driggs and Hurley cases inconsistent therewith must be deemed to be disapproved," it appears that the requirement of wantonness, flagrant or reckless disregard of the safety of others, or wilful indifference, was deleted from the definition of criminal negligence or lack of due care and circumspection.

The law in California as to what constitutes "criminal negligence" or a lack of "due caution and circumspection" is confused.

The cases of *People* v. *Driggs, supra,* 111 Cal.App. 42, and *People* v. *Hurley, supra,* 13 Cal.App.2d 208, which held that some measure of wantonness or flagrant or reckless disregard of the safety of others must enter into defendant's conduct before he could be held guilty of criminal negligence, were disapproved in *People* v. *Pociask, supra.* The Driggs case involved assault with intent to commit murder; the Hurley case involved death caused by the driving of an automobile. The Pociask case which disapproved them involved the negligent driving of an automobile and the interpretation of a statute (former section 500, Vehicle Code) which specifically made criminal the negligent driving of a vehicle. The instruction in *People* v. *Wilson, supra,* 193 Cal. 512 (which is substantially the same as the one here involved) was approved by the Pociask case. The Wilson case was a manslaughter conviction arising out of the negligent driving of a motor vehicle. The court in the Pociask case, *supra,* comments on the opinion of the Supreme Court in denying a hearing in the case of *People* v. *Seiler,* 57 Cal.App. 195 [207 P. 396], wherein it was said: "The statute (Pen. Code, § 192, subd. 2) defines involuntary manslaughter of this specific character as the unlawful killing of a human being, involuntarily, but 'in the commission of a lawful act which might produce death . . . without due caution and circumspection.' In order to constitute this kind of manslaughter the act may be lawful but it must be one which might produce death, and which does produce death, and it must be committed without due caution and circumspection. The lack of due caution and circumspection *need not go to the extent of being wanton or reckless, although it might possibly be such as would be defined as culpable.*" (Emphasis added.) In 1941 the negligent

---

homicide statute (Veh. Code, § 500) was amended by deleting the words "in a negligent manner or in the commission of an unlawful act not amounting to a felony" and substituting therefor "with reckless disregard of, or wilful indifference to, the safety of others." In *People* v. *Young*, 20 Cal.2d 832 [129 P.2d 353], the court concluded that in amending the statute the Legislature intended that something more than ordinary negligence was to be required as a basis for criminal liability thereunder and that the phrase used in the amendment must be considered as being similar in meaning to wilful misconduct. (*People* v. *Murray*, 58 Cal.App.2d 239 [136 P.2d 389]; *People* v. *Freeman*, 61 Cal.App.2d 110 [142 P.2d 435].) In 1943, the negligent homicide statute (Veh. Code, § 500) was repealed (Stats. 1943, ch. 421, § 1). At the same time, the Legislature (Stats. 1943, ch. 421, § 2) amended the Penal Code, section 193, so that it provided a smaller penalty for involuntary manslaughter resulting from the operation of a vehicle. In 1945, Penal Code, section 192, was amended (Stats. 1945, ch. 1006, pp. 1942-1943) to its present form. At present, different standards are set forth for deaths caused through the operation of a vehicle and deaths otherwise caused. We are here concerned with a death occurring other than by vehicle and with the meaning of the words "due caution and circumspection. It would appear that a definite line should be drawn as to the meaning to be given the words "due caution and circumspection" and the words "gross negligence" as used in the sections involving vehicles (192.3, subds. (a) (b)) and that a workable and usable rule of law should be formulated for the future. A résumé of the cases will show the confusion which exists with respect to the proper definition of criminal negligence or lack of due caution and circumspection as it relates to involuntary manslaughter.

*People* v. *Driggs, supra,* 111 Cal.App. 42, 47, involved an assault with intent to commit murder. The rule was said to be: "In order to constitute criminal negligence [lack of due caution and circumspection], there must enter into the act some measure of wantonness or flagrant or reckless disregard of the safety of others, or wilful indifference. If no one of these elements enters into the act, the person charged cannot be held guilty of criminal negligence." This rule was erroneously (28 Cal.L.Rev. 418, 520) disapproved in *People* v. *Pociask, supra,* 14 Cal.2d 679, 684. The Pociask case involved the interpretation of former section 500 of the Vehicle Code which made mere negligent driving a criminal offense.

In *People* v. *Anderson,* 58 Cal.App. 267 [208 P. 324], there are no facts set forth from which it can be ascertained how the homicide was accomplished, but it is obvious that it was not by motor vehicle. The court held there, citing a motor vehicle case (denial of petition for hearing, opinion by Supreme Court, *People* v. *Seiler, supra,* 57 Cal.App. 195) that the lack of due caution and circumspection need not go to the extent of being wanton or reckless, although it might possibly be such as would be defined as culpable. The court concluded it was not necessary to instruct the jury on the meaning of due caution and circumspection.

In *People* v. *Sidwell,* 29 Cal.App. 12 [154 P. 290], defendant was charged with involuntary manslaughter; the death occurred through the medium of a revolver. It was there held (p. 17) that ''it will be observed that, while involuntary manslaughter may be committed in two different ways, the legislature has not recognized, as between those two ways [192, subd. 2], any distinction in the degree of turpitude characterizing that crime. In other words, the crime is that of involuntary manslaughter, whether the killing be committed in the execution of an unlawful act, etc., or in the execution of a lawful act, etc., or where death, not willfully or intentionally produced, is, nevertheless, caused by the *gross or culpable negligence* of the defendant—negligence which, in degree, goes so far beyond that negligence merely which suffices to impose a civil liability for damages as to constitute it criminal negligence for which the party guilty of it may be held criminally liable.'' (Emphasis added.)

In *People* v. *Sica,* 76 Cal.App. 648, 651 [245 P. 461], it was held that the ''reckless'' handling of firearms so as to cause death constituted manslaughter committed in the commission of a lawful act, which might produce death, ''without due caution and circumspection.''

In *People* v. *Searle,* 33 Cal.App. 228, 231 [164 P. 819], the homicide was committed through criminal negligence in handling a gun. The court said, '' 'An unintentional homicide committed through the negligent handling of a firearm in a way indicating a reckless disregard of life is manslaughter. It is negligence to point a firearm at another without examining to see whether or not it is loaded, or to handle or use it in a place where a discharge is likely to injure another, as in a highway.' (1 Michie on Homicide, p. 253.) ''

In *People* v. *Mount,* 93 Cal.App. 81 [269 P. 177], a death

resulted because of an abortion and defendant was convicted of manslaughter. It was noted that the deceased came to her death by reason of the "gross negligence" of defendant and his "negligence" and "careless and incompetent treatment."

In *People* v. *Montecino,* 66 Cal.App.2d 85, 102 [152 P.2d 5], which involved the death of an elderly, bedridden woman by reason of the brutal treatment and lack of care on the part of defendant, the court held that "it is established in the State of California that involuntary manslaughter may result even though the conduct of the offender is not wanton or reckless. See comment by the Supreme Court in denying a hearing in *People* v. *Seiler* (1922), 57 Cal.App. 195 [207 P. 396], . . ." The Seiler case, as heretofore noted, was a negligent driving case.

In *People* v. *Chavez,* 77 Cal.App.2d 621, 628 [176 P.2d 92], defendant was convicted of involuntary manslaughter because she failed to use "due care" or "any of the care" necessary for the welfare of her newborn baby. It was said: "While it is conceivable that in some such cases the mental and physical condition of a mother, at the time, might prevent her from exercising that *reasonable care* which would ordinarily be required . . ." that such was not the case at hand. (Emphasis added.)

In *People* v. *Neff,* 117 Cal.App.2d 772 [257 P.2d 47], death occurred by reason of carbon monoxide escaping from a badly vented gas heater. The court there cited the automobile-manslaughter cases, particularly *People* v. *Pociask, supra,* 14 Cal.2d 679, and *People* v. *Seiler, supra,* 57 Cal. App. 195, in discussing the instructions given. The following instruction was given there: "Due caution and circumspection, as those words are used in the instruction just given, means such caution and circumspection as are reasonably appropriate to avoid injury to one's self and others, under the conditions at hand as they would be viewed by an ordinary reasonable person in the same situation as the person whose conduct is in question. To exercise due care and circumspection is to take those proper precautions which a person of ordinary prudence would use in the same circumstances. [*Conduct does not need to amount to wantonness or to recklessness to show and to constitute a lack of due care and circumspection.*]" The District Court of Appeal there held: "The court should not have included in its instructions the statement to the effect that a lack of due caution and circumspection need not amount to wantonness or recklessness.

People's instruction No. 16, except for the statement therein in brackets (to the effect that the conduct need not amount to wantonness or recklessness), was a proper instruction.'' (P. 785.) This statement could mean an approval of former decisions that wantonness or recklessness was necessary, or just an attempt to satisfy former decisions as they related to vehicle-manslaughter.

In *People* v. *Freudenberg, supra,* 121 Cal.App.2d 564, 580, where death resulted from a firearm, the jury was held properly instructed as follows: ''The doing of an act ordinarily lawful which results in the death of a human being may be manslaughter where the act, being one which might cause death, is performed in an unlawful manner or without due caution or circumspection. When a person is doing anything dangerous in itself or has charge of anything dangerous in its use and acts with reference thereto without taking those proper precautions which a person of ordinary prudence would have used under the circumstances, and the death of another results therefrom, his act or neglect is a criminal act against the person so killed *even though his negligence does not amount to a wanton or reckless disregard of human safety or life.''\** (Emphasis added.)

In *People* v. *Mahoney,* 201 Cal. 618, 629 [258 P. 607], defectively constructed grandstands collapsed and a woman was killed as a result thereof. While very few facts appear in the opinion, the court said: ''The prosecution of the appellant was had under section 192 of the Penal Code, defining the crime of manslaughter, and upon the theory that in the erection and construction of the stands the appellant did not exercise due caution and circumspection. We deem it unnecessary to review the nearly two thousand pages of testimony taken in the court below. It suffices to say that there is evidence from which the jury might well conclude that the grandstand which collapsed was so *negligently* constructed as to be unable to carry the tremendous load placed upon it.'' (Emphasis added.) It would appear that in this particular case, ''negligence'' and ''due caution and circumspection'' were considered synonymous.

In *People* v. *McGee,* 31 Cal.2d 229, 238 [187 P.2d 706], which involved a manslaughter conviction, it was held proper to give the code definition of involuntary manslaughter (Pen. Code, § 192, subd. 2) because ''If defendant, as he testified, discharged the pistol with intent only to frighten, and not to

---

*Emphasized portion is not found in instruction in present case.

shoot deceased, and such act was not done in the exercise of defendant's right of self-defense, he could be found guilty of involuntary manslaughter. (See 23 A.L.R. 1554; 55 A.L.R. 921.) The instruction appropriately covers evidence which the jury could—and may—have found true.''

In *People* v. *Southack*, 39 Cal.2d 578, 584 [248 P.2d 12], a manslaughter case involving a gun, the court said: ''The above summarized evidence is sufficient to support a finding of manslaughter, either voluntary in 'heat of passion' (Pen. Code, § 192, subd. 1) or involuntary. The involuntary manslaughter might be 'in the commission of an unlawful act, not amounting to felony' (Pen. Code, § 192, subd. 2), for it could be found that defendant unlawfully exhibited the gun in an angry manner, a misdemeanor (Pen. Code, § 417), or it might be 'in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection' (Pen. Code, § 192, subd. 2), for it could be found that defendant was simply holding the gun but that he was *negligent* in so doing. (See *People* v. *McGee* (1947), 31 Cal.2d 229, 238 [187 P.2d 706]; *People* v. *Carmen* (1951), 36 Cal.2d 768, 774 [228 P.2d 281].)'' (Emphasis added.)

We have here endeavored to set forth as many cases involving involuntary manslaughter by means *other* than vehicle as could be found in the California Reports to show the earliest and latest pronouncements of this court and any appellate court on the subject. The earliest case found on the subject was *People* v. *Keefer* (1861), 18 Cal. 636, wherein the court said: ''We know nothing of the facts of the case, and intimate no opinion as to the merits of the controversy.'' It was also said, by way of discussion, that ''No doubt exists that a man may be guilty of manslaughter under some circumstances by his *mere carelessness*. But this rule has no application to a statutory offense like that of which the defendant was convicted.'' (Emphasis added.) The Driggs case, *supra*, since overruled, pointed out that some measure of wantonness, recklessness, or the like must enter the picture before one could be guilty of criminal negligence, or a lack of due caution and circumspection. So far as the latest cases are concerned, it appears that mere negligence is sufficient to constitute a lack of due caution and circumspection under the manslaughter statute (Pen. Code, § 192, subd. 2). This does not appear to be a correct rule. Something more, in our opinion, is needed to constitute the criminal negligence required for a conviction of manslaughter.

A note in 161 American Law Reports 10, entitled "Homicide Through Culpable Negligence" seeks to reconcile the California cases. It is suggested (p. 50) that section 20 of the Penal Code provides that "In every crime or public offense there must exist a union or joint operation of act and intent, or criminal negligence"; that section 7, subdivision 2, of the Penal Code provides that "The words 'neglect,' 'negligence,' 'negligent,' and 'negligently' import a want of such attention to the nature or probable consequences of the act or omission as a prudent man ordinarily bestows in acting in his own concerns"; and that these two sections have "perhaps" influenced the California courts' interpretation of "criminal negligence." It is pointed out that the *general rule is that something more than ordinary negligence is needed to constitute either culpable negligence or criminal negligence under involuntary manslaughter statutes.*

Two law review notes (25 Cal.L.Rev. 1; 28 Cal.L.Rev. 518) seek to harmonize the negligent homicide decisions (under the Vehicle Code) with the involuntary manslaughter ones in California. It should be noted that these articles were both written prior to 1945 when the involuntary manslaughter statute was enacted in its present form.

It is pointed out in 28 California Law Review 518, 519, that a review of the available authority of the half century prior to 1872 (when section 20 of the Penal Code was enacted) supports the conclusion that "criminal negligence" had a common law meaning at that time which must be referred to in determining the effect of its inclusion in section 20. The English reports of the period reveal a well established rule that gross negligence is necessary in criminal prosecutions, and that the term "criminal negligence" was used along with many others to characterize the degree of neglect required. It is said that there was nothing to show that the Legislature intended to except section 192 of the Penal Code from the operation of section 20 of the same code. In speaking of *People* v. *Pociask,* 14 Cal.2d 679 [96 P.2d 788], it was noted that "having disposed of the defendant's argument by holding that 'criminal negligence' was not necessary under section 500 of the Vehicle Code, it was not necessary for the court to resolve the conflict between the Driggs and Hurley cases, requiring an element of wantonness as contended by defendant, and previous cases holding that deliberate disregard of the safety of others is not necessary to a prosecution for manslaughter; yet the court took the occasion to repudiate

the two cases relied upon by defendant. Neither the previous authority nor the principal case hold that civil negligence is sufficient in manslaughter cases, but only that offered definitions of 'due caution and circumspection' were incorrect or else did not add anything. Still other California cases, never overruled, require a degree of negligence beyond that necessary to civil liability, so there is still room for doubt as to how the court conceives 'criminal negligence' to be defined in section 192." It is concluded that an instruction that a defendant should *not* be convicted of manslaughter for the usual lack of ordinary care would be much more favorable to the defendant, more understandable and more in accord with the established practice in most other jurisdictions than the supposedly self-explanatory "due caution and circumspection."

In the other note (25 Cal.L.Rev. 1, 30) is found this statement: "The main question is, therefore, what does 'without due caution and circumspection' mean; what degree of culpability is required? The law on this point seems in California to be less settled and less clear than in other jurisdictions." After quoting an instruction identical with the one in the present case except for the words "even though his negligence does not amount to a wanton or reckless disregard of human safety or life" which are not present in our case, the writer notes that "It is not easy to understand the true significance of this rule. Did the supreme court therein formulate the proposition that ordinary (civil) negligence would suffice to constitute manslaughter? Certainly California has widened the concept of criminal negligence necessary to constitute manslaughter further than most of the other jurisdictions. But it does not seem correct to say that the quoted passages from *People* v. *Seiler* and *People* v. *Wilson* [both automobile-manslaughter cases] are authority for the proposition that the negligence which suffices as the basis for civil liability and the negligence which is the foundation for criminal liability under the manslaughter statute are of the same degree. To be sure the language of the court contains a term which is customarily used in the definition of civil negligence, namely, the following: 'precautions which a person of ordinary prudence could have used under the circumstances.' But as a whole the definition differs from that of ordinary negligence, including, as it does, the element of something dangerous in itself or in its use. Furthermore, the court admitted in the quoted passage from *People* v. *Seiler* that the lack of due

caution and circumspection might be such as would be defined as culpable, even though this word was not considered to be a proper term to convey the significance of due caution and circumspection."

In the two most recently filed civil liability cases before this court (*Jensen* v. *Minard, ante,* p. 325 [282 P.2d 7] and *Warner* v. *Santa Catalina Island Co., ante,* p. 310 [282 P.2d 12]) we were concerned with personal injuries occurring because of the negligent handling of dangerous instrumentalities (a gun, and shooting gallery cartridges). We concluded, in both cases, that the standard of care in such cases was so great that a slight deviation therefrom would constitute negligence. In the case at hand, the jury was instructed in part that "When a person is doing anything dangerous in itself or has charge of anything dangerous in its use and acts with reference thereto without taking those proper precautions which a person of ordinary prudence would have used under the circumstances and the death of another results therefrom, his act or neglect is a criminal act against the person so killed." It appears that this instruction is the same principle we have so recently applied in *civil* liability cases.

The statute (Pen. Code, § 192, subd. 2) provides (in part) that in order to convict a person of involuntary manslaughter, there shall be an unlawful killing of a human being in the commission of a lawful act which might produce death without due caution and circumspecton. The words lack of "due caution and circumspection" have been heretofore held to be the equivalent of "criminal negligence" (Pen. Code, § 20). The general rule is set forth in 26 American Jurisprudence, Homicide, section 210, page 299, as follows: "The authorities are agreed, in the absence of statutory regulations denouncing certain acts as criminal, that in order to impose criminal liability for a homicide caused by negligence, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences." The article continues thus: "Aside from the facts that a more culpable degree of negligence is required in order to establish

a criminal homicide than is required in a civil action for damages and that contributory negligence is not a defense, criminal responsibility for a negligent homicide is ordinarily to be determined pursuant to the general principles of negligence, the fundamental of which is knowledge, actual or imputed, that the act of the slayer tended to endanger life. The facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen. It must appear that the death was not the result of misadventure, but the natural and probable result of a reckless or culpably negligent act.''

We hold, therefore, that the general rule just quoted, sets forth the standard to be used in California for negligent homicide (Pen. Code, § 192, subd. 2) in other than vehicle cases. Defendant here was charged with a violation of section 192, subdivision 2, of the Penal Code. The jury should have been instructed according to the rule which generally prevails in this country as to what constitutes criminal negligence, or lack of due caution and circumspection so that her guilt or innocence might be determined in accord therewith.

Because of the errors heretofore noted, the judgment is reversed.

Gibson, C. J., Traynor, J., and Schauer, J., concurred.