455 P.2d 981

**STATE of Arizona, Appellee,**

v.

**Gregory George SORENSEN, Appellant.**

**No. 1795.**

Supreme Court of Arizona.

In Banc.

June 13, 1969.

Gary K. Nelson, Atty. Gen., Darrell F. Smith, Former Atty. Gen., Carl Waag, Asst. Atty. Gen., Phoenix, for appellee.

John E. Lindberg, Richard E. Bailey, Tucson, for appellant.

HATHAWAY, Judge:

Gregory George Sorensen, was charged with first degree murder of his 22-month old stepson, Bryan Scott Pickens. The murder allegedly took place on May 13, 1966. Sorensen, approximately 21 years old, was brought to trial on February 20, 1967. The jury returned a guilty verdict on March 2, 1967, and it determined that the penalty should be death. Judgment was subsequently entered and on March 21, 1967, the defendant was sentenced to death in the gas chamber, hence this appeal.

The defendant presents some 15 questions for review, which we have carefully examined. We have concluded that this cause must be reversed and remanded for a new

trial for reasons which we will discuss after the following brief summary of the facts.

In August of 1965, while living in Safford, Arizona, Sorensen married a young woman, named Charlene Melton, who at that time had an infant child, the decedent, Bryan Scott Pickens. Following the marriage, Sorensen and his wife moved to Tucson, where he took a job as a gas station attendant. Bryan spent some of the time with Mrs. Sorensen's parents in Safford and some of the time with the Sorensens in Tucson.

On the 11th and 12th of May, 1966, the Sorensens visited in Safford. On the evening of the 12th, between 7 and 7:30, Charlene changed Bryan's clothes, including his diaper and observed that he was in good general physical condition at that time. They then returned to Tucson, bringing Bryan with them. The next morning Charlene got up at 7 or 7:30, checked the baby and covered him up since he was still asleep and prepared to go to the beauty shop where she worked as a hairdresser. It was Gregory's day off and he was going to stay home and take care of Bryan.

After getting ready to go to work, Charlene went into the bedroom, where Gregg was still in bed, and asked if he would take her to work. He stated that he was not feeling well, that he had a cold, but he got up, dressed and at about 8:30 a. m., took her to the beauty shop, located about a block and a half away.

She worked all day until about 4:45 p. m. when she received a telephone call. The call was from Gregg who said, "Charlene, the baby has been hurt. I was playing with him or was carrying him and the dog ran into my feet and I dropped him. He won't talk to me; he looks funny; he won't say anything." Gregg told Charlene that he would bring the baby over. She told her boss what Gregg had said and they agreed that Charlene should check upon Bryan.

She left and started running. She met Gregg as he approached in the car. She opened the door, saw the baby lying on the seat and exclaimed, "My God, Gregg, he's dead!" Gregg answered, "No, he isn't. His heart is still beating. Breathe in his mouth." Charlene attempted to administer mouth-to-mouth resuscitation as they drove to the Tucson Clinic. Upon arrival at the Clinic, she took Bryan in while Gregg parked the car. Doctors at the Clinic worked on him and obtained a heartbeat. Bryan was removed in an ambulance to the hospital where he died at about 6:15 p. m. The cause of death was skull fracture with cerebral hemorrhage. Two skull fractures were revealed and the medical opinion was that they were caused by several blows, of comparable force to hitting a baseball with a baseball bat. Other injuries indicated that the child had been sexually assaulted, i. e., most of the head of the penis was black and gangrenous in appearance and at the base of the penis, where it joins the major portion of the body, there were small punctate wounds which extended down and around the scrotum. The anus was injured through insertion of a round-tipped object such as a penis or a broomstick.

The defendant explained that the head injuries were caused when he was playing with the child, tossing him into the air and catching him, while backing out of the bedroom, when their little poodle startled him by jumping against his leg, causing him to stumble back and Bryan fell on the step between the bedroom and the living room. There is medical testimony that the head injuries could have been caused by such a fall. As for the other injuries, the defendant explained that the child had a diaper rash. While he was applying vaseline to the irritated area, the child had an erection and Sorensen "flicked" the child's penis with his finger to make it go down.

## ARGUMENT

■ We have concluded that this cause must be reversed and remanded for new trial because of improper argument to the jury by the prosecutor, which we will

therefore discuss first. The portion of the prosecutor's argument where the defendant contends prejudicial error was committed, follows:

"There are two areas of character testimony that would have been material in this case. One is what they ask; namely, do you have an opinion as to his reputation for being a peaceful, quiet, law abiding citizen. They also could have asked, do you have an opinion as to his reputation in the community for truth and veracity?

MR. BAILEY: If the Court please, it is not admissible and therefore it could not come in.

MR. PEDERSEN: Is it admissible if he takes the stand?

THE COURT: Overruled. Proceed.

MR. PEDERSEN: This was not gone into."

■ In a murder trial, the defense may put on character witnesses showing the defendant's reputation for a peaceable disposition, quiet demeanor and even temper, and for being a law abiding citizen. Arizona Law of Evidence, Udall, § 114, at 223. Where the defendant testified, " * * and the prosecution thereafter does not offer evidence of his bad reputation for truth and veracity, *the defendant has no right to offer evidence as to his good reputation for those traits, as in that regard he stands unimpeached."* (Emphasis added.) Arizona Law of Evidence, Udall § 66, at 102.

■■ In Baumgartner v. State, 20 Ariz. 157, 163, 178 P. 30 (1919), where the prosecution did not attack the defendant's reputation for truth and veracity, we held that evidence to sustain his credibility was not admissible. Though wide latitude is afforded counsel in argument, the argument must be based on facts which the jury is entitled to find from the evidence. Argument must not be based on " * * * extraneous matters that were not *or could not* be received in evidence." State v. Neil, 102 Ariz. 299, 428 P.2d 676, 677 (1967). (Emphasis added.)

The state contends that even if Baumgartner v. State, supra, is still the law of

Arizona, and we affirm that it is, the defendant could not have been harmed by the comment and discussion and the error was harmless. We cannot so lightly cast off this error. The prejudicial effect of the prosecutor's utterance is particularly apparent when we consider that the entire defense was dependent upon defendant's testimony. State v. Welsch, 29 N.J. 152, 148 A.2d 313 (1959). Proper objection was made and had it been sustained and had the jury been fully admonished of the impropriety of the prosecutor's argument and that any inferences suggested thereby were improper and not to be considered by them, error may have been avoided.

Since the objection was overruled, the sanction by the trial court of the improper creation of an issue of bad repute for veracity added weight to the argument and the jury took the case with the misunderstanding that the defense could have put on character witnesses, vouching for his reputation for truthfulness. His failure to do so invited the inference that he was of such poor reputation for truthfulness that character witnesses were unobtainable. If the jury chose this route, and they may have, the defense would have been destroyed.

■ We find in the record one place where the defendant disagreed with a State witness's version of a conversation with the defendant which took place on the evening of the homicide. A witness, a deputy sheriff, testified that the defendant had told him that he (the defendant) " * * * resented the boy and he was jealous of the boy, and he felt that the boy was jealous." On cross-examination, the defendant testified that he had told the deputy sheriff that he was fond of the boy and did not recall stating that there was jealousy between the two and denied making such a statement. This contradiction is not sufficient to place the defendant's character for truthfulness in issue. The disagreement is perfectly consistent with the general good character of both witnesses for truth. The reason for the disagreement may be forgetfulness,

misunderstanding, or other possible causes. The character of neither witness for truthfulness having been assailed, neither's testimony may be fortified by character witnesses. Wigmore, Evidence § 1109 (3d Ed.); Creech v. State, 168 Tex.Cr.R. 422, 329 S.W.2d 290 (1959).

If character witnesses were allowed to bolster testimony wherever contradictions occurred, trials would become endless. Supporting witnesses and supporting witnesses for the supporting witnesses, ad infinitum, would stifle attempts to ascertain truth in the central issues in controversy which would become obscured in the interminable side issues.

We cannot assume that this improper attack upon the defendant's truthfulness was not the cause of his conviction. Additional points have been raised which may again arise during the new trial and which we now consider.

## INSTRUCTIONS

■■ The jury was instructed on first degree murder and the defendant's request that instructions also be given on second degree murder and manslaughter was refused. For the court to have properly instructed on second degree murder, the evidence reasonably construed, should tend to show a lack of premeditation and deliberation. *The presence of such evidence* is the determinative factor. State v. Schroeder, 95 Ariz. 255, 389 P.2d 255, cert. den. 379 U.S. 939, 85 S.Ct. 347, 13 L.Ed.2d 350 (1964). We have carefully considered the evidence and are unable to glean from the record any showing of lack of premeditation or deliberation. The possibility that the jury might reject portions of the State's evidence which tends to establish premeditation and deliberation as suggested by defense counsel, does not permit an instruction on second degree murder. State v. Schroeder, supra.

The defendant contends that the jury should have been instructed on involuntary manslaughter because they could have found that the fatal injuries were caused as the defendant said, " * * * but that

he was grossly and criminally negligent (possibly arising from animosity toward the child) and that he was, therefore, guilty of involuntary manslaughter."

■■ To justify instruction on involuntary manslaughter, some view of the evidence must bring the defendant's conduct within our manslaughter statutes, A.R.S. § 13–455 and A.R.S. § 13–456 which provide that manslaughter " * * * is the unlawful killing of a human being without malice," and is involuntary when resulting from " * * * the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner, or *without due caution or circumspection."* (Emphasis supplied.)

We find nothing in the evidence which would establish that the death resulted from an unlawful act not amounting to a felony, nor should that conclusion be opened to the jury. To constitute involuntary manslaughter, the homicide must have resulted from the defendant's failure to exercise due caution and circumspection, which has been held to be the equivalent of "criminal negligence" or "culpable negligence." People v. Penny, 44 Cal.2d 861, 285 P.2d 926 (1955); People v. Driggs, 111 Cal.App. 42, 295 P. 51 (1931); People v. Hurley, 13 Cal.App.2d 208, 56 P.2d 978 (1936). Our statute was adopted from California, and we find that helpful guidelines relating to the standard of care applicable to negligent homicide were established by the California Supreme Court in People v. Penny, supra. There, the California Supreme Court, in an effort to clear away confusion, set forth the following, taken from 26 Am.Jur. Homicide § 210, p. 299, as the standard:

"The authorities are agreed, in the absence of statutory regulations denouncing certain acts as criminal, that in order to impose criminal liability for a homicide caused by negligence, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reck-

less, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.

\* \* \* \* \* \*

"Aside from the facts that a more culpable degree of negligence is required in order to establish a criminal homicide than is required in a civil action for damages and that contributory negligence is not a defense, criminal responsibility for a negligent homicide is ordinarily to be determined pursuant to the general principles of negligence, the fundamental of which is knowledge, actual or imputed, that the act of the slayer tended to endanger life. The facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen. It must appear that the death was not the result of misadventure, but the natural and probable result of a reckless or culpably negligent act." People v. Penny, supra, 285 P.2d at 937.

We hold that the foregoing rule sets forth the standard to be used in Arizona to determine whether a homicide was caused without due caution and circumspection, A.R.S. § 13–456. If the defendant's testimony had been accepted by the jury, it would have established that Sorensen was playing with the baby throwing him up and catching him, while backing from the bedroom into the living room. The small dog jumped against his leg, causing him to trip, and he dropped the baby. The baby fell on the step, between the two rooms, and suffered the head injuries from which he died. This version would not support a conviction of involuntary manslaughter. Playing with the child—tossing and catching him—is not an act which tends to endanger life, particularly in consideration of the height limitation to which the child could have been thrown here in view of the comparatively low ceiling. In line with the foregoing standards of criminal negligence, and accepting the defendant's testimony, the death resulted from misadventure. The little dog's intervention transformed a frolic into a tragedy. The jury was properly instructed that the defendant should not be held accountable for such misadventure.

■ Since the evidence was not sufficient to support a verdict of involuntary manslaughter, we hold that refusal to give an instruction on involuntary manslaughter was not error. State v. Madden, 104 Ariz. 111, 449 P.2d 39 (1969); State v. Schroeder, supra.

■ Defense counsel contends that the court erroneouly rejected the defendant's proposed instruction No. 11, which added to the instruction on circumstantial evidence, "that *each fact* which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt." Defense counsel have cited no authority for inclusion of their proffered addendum to the circumstantial evidence instruction. Nor have they shown that the jury was not properly instructed. We are of a mind that the trial court proceeded wisely in rejecting the proposed addition to the circumstantial evidence instruction. Were it given, the jury would surely have been confused, since the court instructed them that circumstantial and direct evidence are of equal probative value. For the court to then instruct, that before circumstantial evidence may be accepted each link in the chain of circumstantial evidence must be proved beyond a reasonable doubt, is to categorize it as inferior to direct evidence, where they must choose from conflicting versions. In United States v. Hall, 198 F.2d 726, 730, 34 A.L.R.2d 1088 (2d Cir. 1952) cert. den. Hall v. United States, 345 U.S. 905, 73 S.Ct. 641, 97 L.Ed. 1341, the court stated:

"However heavy the evidential burden on the prosecution here, it can hardly be held more exacting than the 'proof beyond a reasonable doubt' of an ordinary criminal case before a jury. We have

been often pressed, but have consistently refused, to apply this formula to each link in the chain of alleged events in order that if as to any the proof is not thus overwhelming there must be a reversal of a verdict of guilt. Instead we have said that the process of drawing inferences is to be governed, as ordinarily, by human experience, that indeed no other rule of jury fact finding has a claim to reality, and that the strict requirement as to burden of proof constitutes an overall admonition or warning, rather than a precise yardstick to be applied to each isolable segment of the proof. (citing cases)"

In Gariepy v. United States, 189 F.2d 459, 462 (6th Cir. 1951), cited in Hall the court stated:

"As to the second, the appellant appears to confuse the function of the court with that of the jury. In United States v. Valenti, 2 Cir., 134 F.2d 362, 364 certiorari denied 319 U.S. 761, 63 S.Ct. 1317, 87 L.Ed. 1712, Judge Clark made a careful study of the applicable rule, and we accept fully his conclusions. 'The requirement of proof beyond a reasonable *doubt is a direction to the jury, not a* rule of evidence; it operates on the whole case, and not on separate bits of evidence each of which need not be so proven; and it cannot be accorded a quantitative value other than as a general cautionary admonition. (citing cases) It is the court's function to decide whether evidence is competent to justify certain inferences; it is not the court's function to decide which of various inferences should be drawn.' "

*See* also State v. Hoffman, 78 Ariz. 319, 279 P.2d 898 (1955) and United States v. Valenti, 134 F.2d 362 (2d Cir. 1943), cert. den., 319 U.S. 761, 63 S.Ct. 1317, 87 L.Ed. 1712, rehearing den. 320 U.S. 809, 64 S.Ct. 29, 88 L.Ed. 489.

 The defendant requested that an instruction on absence of flight should have been given, arguing that "where flight is shown in the evidence, an instruction thereon is proper and not an undue comment on the evidence." State v. McLain, 74 Ariz. 132, 245 P.2d 278 (1952). Instructions on flight seem to be premised on " * * * the supposition that with a consciousness of guilt, 'the wicked flee when no man pursueth' to avoid punishment," as observed by this Court though Justice Lorna E. Lockwood in State v. Owen, 94 Ariz. 404, 411, 385 P.2d 700 (1963), vacated, 378 U.S. 574, 84 S.Ct. 1932, 12 L.Ed.2d 1041. Considering the rest of the proverb, " * * * but the righteous are bold as a lion," it would seem to follow that boldness infers innocence. Contemplated, however, is the state of mind of the guilty and the innocent. Verily, flight to escape detection or capture is circumstantial evidence of guilt. Absence of flight under other circumstances may seem far better calculated to avoid detection. Absence of flight does not necessarily reflect the state of mind. Would that detection of criminals were so simple.

We see no prejudice to the defendant, in the trial court's refusal to give the instruction, since the jury is free to draw all reasonable inferences from the absence of flight, without specific instructions from the court. The matter is more properly one of argument.

Of the other points that have been raised, some we have not discussed because they are without merit; others require no discussion in view of the disposition made herein.

Reversed and remanded for a new trial.

UDALL, C. J., LOCKWOOD, V. C. J., and STRUCKMEYER and McFARLAND, JJ., concur.

Note: Justice CHARLES C. BERNSTEIN, sitting on the Court at the time of submission of this case disqualified himself and the Honorable JAMES D. HATHAWAY, Judge of the Court of Appeals, Division Two, was called in to sit in his stead and participate in the determination of this case.