550 P.2d 641

STATE of Arizona, Appellee,

v.

Walter Harry DeGRAW, Jr., Appellant.

No. I CA–CR 1119.

Court of Appeals of Arizona,
Division 1,
Department B.

June 8, 1976.
Rehearing Denied July 27, 1976.
Review Denied Sept. 14, 1976.

Bruce E. Babbitt, Atty. Gen., by William J. Schafer, III, Chief Counsel, Crim. Div. and Shirley Frondorf, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender, by Garth V. Smith, Deputy Public Defender, Phoenix, for appellant.

## OPINION

HAIRE, Chief Judge, Division 1.

The defendant was charged with murder and found guilty of involuntary manslaughter. He submitted to the trial judge the issue of his guilt or innocence based upon evidence presented at a prior jury trial which had resulted in a mistrial because the jury could not reach a verdict. He now appeals from the trial court's judgment of guilt and sentence to a term of from eight to ten years in the Arizona State Prison.

On July 16, 1973, Connie Ann DeGraw was shot through the head by her husband, the defendant. The weapon was a .45 caliber single-action revolver. The defendant readily admitted to the police that he killed his wife, but claimed that the shooting, which took place in the couple's house trailer, was an accident which occurred while he was unloading the revolver while preparing to clean it. A pathologist testified that the muzzle of the revolver must have been held no further than "an inch or two at the very most" from the victim's head. His opinion was based upon massive powder burns and internal fractures within the skull, characteristic of a shot fired at extremely close range. In a police interview shortly after the death, the defendant had stated that his wife had gotten up from the couch, and was three or four feet away when the gun discharged. He denied that the gun could have been an inch from his wife's head, and maintained that the death was an unfortunate accident.

Pictures and measurements of the scene of the shooting were taken by investigating officers both immediately after the shooting, and some four days later pursuant to a search warrant. A complaint was filed and warrants issued for defendant's arrest more than ten months after the shooting. Additional facts will be provided throughout this opinion when pertinent to the issues discussed.

The following matters are claimed by the defendant as error:

1. He was denied his right to a speedy trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

2. The trial court erred in denying his motion to suppress evidence seized from his house trailer pursuant to a search warrant.

3. The judgment of guilt of involuntary manslaughter was contrary to the law and weight of the evidence.

4. His sentence of not less than eight nor more than ten years was excessive.

## DENIAL OF SPEEDY TRIAL

The contention that there was a denial of defendant's Sixth Amendment right to a speedy trial because of the ten month interim period between the shooting and the filing of the complaint against defendant is without merit. It is well settled that:

> ". . . it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment."

*United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468, 479 (1971). *Accord State v. Robles,* 110 Ariz. 184, 516 P.2d 320 (1973); *State v. Jackson,* 17 Ariz.App. 533, 499 P.2d 111 (1972). The Marion court specifically rejected an argument similar to that presented here. However, there has been a recognition that pre-indictment delay may violate a person's Fifth and Fourteenth Amendment procedural due process rights when the defendant shows that the state unreasonably delayed prosecution and that such delay substantially prejudiced his defense. *State v. Marks,* 113 Ariz. 7, 546 P. 2d 807 (1976); *State v. Saiz,* 103 Ariz. 567, 447 P.2d 541 (1968). During the interim period between the shooting and the arrest, defendant sold the house trailer in which the shooting took place. Defendant maintains that because there was no indi-

cation that he was a suspect, he did not, prior to the sale of the house trailer and in contemplation of a defense to a criminal prosecution, take pictures and measurements of, or make experiments concerning, the scene of the shooting which purportedly would support his explanation of the July 16, 1973, events. Assuming, without deciding, that the delay was unreasonable, defendant's argument that he was substantially prejudiced by such a delay is unpersuasive. The record indicates that the defendant must have been aware that he was a suspect. Three days after the shooting and in conjunction with giving a statement to the police, he was advised of his Miranda rights. Moreover, the questions asked at that time should have caused the defendant to surmise that the police doubted his story. Finally the measurements and pictures taken and the experiments performed at the house trailer by the police were made available to the defendant to assist him in his defense strategy. We further note that there is no indication that the ten month delay was for the purpose of giving the state a tactical advantage over the defendant. *See United States v. Marion, supra.* We therefore reject defendant's speedy trial contentions.

### THE MOTION TO. SUPPRESS

We next consider defendant's contentions relating to the alleged insufficiency of the affidavit which was the basis for the issuance of a search warrant authorizing a search of the house trailer on July 20, 1973, four days after the shooting. Defendant's argument in this regard can be broken down into two parts.

■ The first argument is based upon the alleged conclusory nature of one statement contained in the search warrant affidavit. The part of the affidavit relating to this portion of defendant's argument reads as follows:

"That the following facts establish probable cause for believing that grounds for the issuance of a search warrant for the aforementioned items exist:

"On the date of July 19, 1973, at approximately 1230 hrs P.M., the affiant learned the following information in the following manner:

"Received County Medical Examiner's Report signed by Dr. Heinz Karnitschnig stating after the examination of the deceased Connie Ann DeGraw Dr. felt because of the size of the wound and the gases embedded in the eye; smudging and soiling of the skin is of the opinion that the wound was a contact wound where the barrel of the weapon would have to be held on the skin or no more than 1 inch away from the skin.

*"This information is contrary to statements made by the deceased's husband, Walter Harry DeGraw."* (Emphasis added).

Defendant contends that the affidavit should have set forth the substance of his statement that his wife was three or four feet away when the gun discharged, therefore allowing the magistrate to draw *the conclusion* as to whether the statement was contrary to the information given by the pathologist. We need not determine defendant's contentions in this regard because, without considering any statements made by the defendant, other portions of the affidavit are sufficient to establish probable cause to believe that the place to be searched contained evidence which related to the homicide involved. While the affidavit did not expressly state that the killing of defendant's wife had occurred in the house trailer to be searched, no deficiency in this regard is raised by defendant. In any event, we note that the affidavit did state that Mrs. DeGraw had been shot in the head with a .45 caliber pistol, and among the described property or things to be obtained were the following:

"Item #5—Blood samples from carpeting located on living room floor area from forementioned mobile home trailer

"Item #6—Blood samples from the wall area around the built in television

set, and living room area of the fore-mentioned mobile home house trailer

\* \* \* \* \* \*

"Item #8—Sample of paneling from the living room area of the aforementioned mobile home house trailer where the projectile lodged."

These items by their very nature are or-dinarily not of a movable nature, and therefore would only be found at the scene of the crime. For this reason, we have no hesitancy in holding that a common sense interpretation of the affidavit would fur-nish sufficient grounds from which the magistrate could have concluded that the homicide had occurred in the house trailer which was the subject of the application for the search warrant. Given that fact, the affidavit was clearly sufficient to es-tablish probable cause to believe that the house trailer contained evidence relating to that crime. In *State v. Sample,* 107 Ariz. 407, 489 P.2d 44 (1971), and in *State v. Duke,* 110 Ariz. 320, 518 P.2d 570 (1974), our Supreme Court pointed out the special considerations involved when search and seizure questions are raised relating to premises upon which a deceased victim has been found. We are aware that in *Sample v. Eyman,* 469 F.2d 819 (9th Cir. 1972), the 9th Circuit Court of Appeals disap-proved the search involved in *State v. Sample, supra.* However, here, unlike the fact situation in either *Sample* or *Duke, supra,* we are not dealing with the question of whether there existed exigent circumstances justifying a warrantless search, but rather a fact situation in which the investigating officer did obtain a search warrant before searching the prem-ises involved.

 Defendant's second argument at-tacking the validity of the search warrant is that it constituted a general warrant. We are not persuaded by defendant's argu-ments in this regard. The search warrant authorized a search for the following items:

"Marriage records, written documents, eyeglasses, all weapons and ammunition, bullethole, blood samples on interior of trailer walls, cushions, and couch; mea-surements of trailer (interior and exteri-or); photographs of trailer, button on floor."

A.R.S. § 13–1442 4 authorizes the issu-ance of a search warrant:

"4. When property or things to be seized consist of any item or constitute any evidence which tends to show that a particular public offense has been com-mitted, or tends to show that a particular person has committed the public of-fense."

Pertinent Arizona case law prescribes that items seized have evidentiary value, and demonstrate a clear nexus to the crime. *See State v. Tosatto,* 107 Ariz. 231, 485 P. 2d 556 (1971) (broken dentures, broken teeth, glasses and expended ·bullet); *see also, Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Where probable cause has been shown, "mere evidence" of a non-communicative nature is subject to search and seizure. *Warden, Maryland Penitentiary v. Hayden, supra.* Here, all of the items included in the search war-rant, with the possible exception of the category "written documents" were de-scribed with sufficient particularity to warrant a reasonable belief that they would have evidentiary value relating to the crime involved. The victim's eyeglass-es were shattered by the fatal shots; the bloodstained carpet and paneling with spent bullets were of evidentiary value for ballistics tests to determine the path of the bullet. The measurements and photos are specifically within the scope of the search warrant provisions of A.R.S. § 13–1446 D. Counsel has cited no authority which would require that we invalidate the entire search warrant because of the inclu-sion of the undefined general category "written documents", and, in any event, if any such documents were seized, there

is no indication that they were used in any way by the prosecutor in the investigation nor were they introduced into evidence. We hold that the trial court properly denied defendant's motion to suppress.

## THE SUFFICIENCY OF THE EVIDENCE

■ The third contention raised by the defendant is that the verdict was not supported by substantial evidence. The trial judge found defendant guilty of involuntary manslaughter.

A.R.S. § 13–456's definition of involuntary manslaughter is as follows:

"A. Manslaughter is of three kinds:

\* \* \* \* \* \*

"2. Involuntary, in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner, or without due caution and circumspection."

In *State v. Sorensen*, 104 Ariz. 503, 455 P.2d 981 (1969), our Supreme Court adopted the principles stated in *People v. Penny*, 44 Cal.2d 861, 285 P.2d 926 (1955), as the standard to be applied in determining whether a homicide had been committed "without due caution and circumspection":

" '. . . the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.

\* \* \* \* \* \*

" 'Aside from the facts that a more culpable degree of negligence is required in order to establish a criminal homicide than is required in a civil action for damages and that contributory negligence is not a defense, criminal responsibility for a negligent homicide is ordinarily to be determined pursuant to the general principles of negligence, the fundamental of which is knowledge, actual or imputed, that the act of the slayer tended to endanger life. The facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen. It must appear that the death was not the result of misadventure, but the natural and probable result of a reckless or culpably negligent act.' " 104 Ariz. at 508, 455 P.2d at 986.

We have reviewed the record, and in our opinion there was substantial evidence in support of the finding of involuntary manslaughter. The defendant was very knowledgeable concerning the proper use and maintenance of guns (member of several gun clubs). The murder weapon was a .45 caliber single-action revolver. According to an expert witness the gun would fire *only* if the hammer was pulled *past* the half-cocked position and pressure was exerted upon the trigger which was surrounded by a trigger guard. The gun had a "light trigger pull". This means that the necessary pressure which had to be applied to the trigger to result in a discharge of the gun was less than that required by normal factory standards for a gun of this type. The following was the expert's testimony as to the proper procedure for unloading this type of weapon:

"A It would be held in a safe direction.

"The hammer would be brought back to the half-cocked position.

"The cylinder would be rotated by hand, and the ejector rod would be operated. This rod is spring loaded and goes back and pushes out the expended cartridge cases, or if you were unloading live rounds, it would push the live rounds out and you would just go to each successive cylinder hole and remove all of the cartridges or all of the expended cartridge cases.

"Q I notice that in your demonstration your hand was not on the trigger, is that right?

"A Yes, sir.

"Q Is that a standard safety trigger?

"A Yes, sir.

"Q And I also notice that the barrel of the gun—

"A I didn't want to scare the Court Recorder, sir.

If upwards is the safest position, that's where I have it, plus having it pointed up, the force of gravity helps get the cases out."

The county medical examiner related to the court that from his initial examination and subsequent autopsy he concluded that the fatal head wound was a result of the gun's barrel being no more than one or two inches from the deceased's head. The ballistics expert testified about tests he had performed with the homicide weapon which had been confiscated by the investigating officers shortly after the shooting. These tests supported the medical examiner's above-mentioned conclusion. Looking at the foregoing facts alone, we find substantial evidence which indicates that the defendant should have foreseen that his activities would endanger life, and that in fact the death was "the natural and probable result of [a] reckless or culpably negligent act." These facts show that the defendant was unloading his gun within two inches of his wife's head. Although an experienced gunman, he did not make sure the area was clear of people, the most basic of procedures when handling a gun. Because the gun discharged while he was unloading it he must have had his finger on the trigger and had the hammer past the half-cocked position, since the expert testified that in his experiments he was unable to make the gun discharge except by applying pressure to the trigger when the hammer was past the half-cocked position. Additional evidence included photographs and measurements taken shortly after the shooting and in the above-discussed search four days later. The photographs were of the trailer's interior. The measurements taken soon after the shooting and in the search, as well as the photographs, all contributed to a police officer's testimony dealing with the trajectory of the bullet as well as various distances within the trailer. In essence this evidence was geared towards discounting the defendant's story that his wife was on the couch rising to a standing position when the shooting occurred. The evidence was manifestly sufficient to support a finding of involuntary manslaughter. We now proceed to appellant's final contention.

### THE SENTENCE

It is well settled in this jurisdiction that the trial court has wide discretion in sentencing matters and a sentence which is within statutory limits will be upheld unless under the circumstances it is so clearly excessive as to constitute an abuse of discretion. *State v. Helmick,* 112 Ariz. 166, 540 P.2d 638 (1975); *State v. Bates,* 111 Ariz. 202, 526 P.2d 1054 (1974). Involuntary manslaughter carries a maximum sentence of ten years. A.R.S. § 13–457. As mentioned earlier, defendant was sentenced to a term of eight to ten years in the state prison. Given the circumstances surrounding the crime and the defendant's previous arrest and conviction record, the trial court in sentencing the defendant clearly acted within its discretion.

The judgment and sentence are affirmed.

JACOBSON, P. J., and EUBANK, J., concurring.