[Criminal No. 914.   Filed January 12, 1942.]

·   [120 Pac. (2d) 793.]

# THE STATE OF ARIZONA, Appellee, v. EVERETT FRYE, Appellant.

Mr. Joe Conway, Attorney General, Mr. Albert M. Garcia, Assistant Attorney General, Mr. Richard F. Harless, County Attorney, and Mr. Darrell R. Parker, Deputy County Attorney, for Appellee.

Mr. W. T. Choisser, for Appellant.

LOCKWOOD, C. J.—Everett Frye, defendant, was arrested by certain deputies sheriff in his home, and was subsequently informed against for the crime of gaming with a roulette wheel, a misdemeanor. At the time of the entry into defendant's home and his arrest, the deputies were acting under and by authority of a search warrant which had theretofore been issued and which was subsequently, but prior to defendant's trial, quashed by the court.

Defendant, upon his arraignment, entered a plea of not guilty, and proceeded to trial. Upon the trial the deputies were allowed by the court, over the objection of defendant's counsel, to testify as to things seen and observed by them and statements made to them by defendant while they were in his home un-

der the search warrant. At the conclusion of the presentation of the state's case, defendant moved for a directed verdict, which was denied, and the jury thereafter found him guilty as charged.

The case comes before us on an appeal and the primary contention is that defendant's constitutional rights and guaranties were violated by the court allowing the deputies to testify as above set forth.

The question presented by the appeal may be stated as follows: When evidence is secured by reason of an entry into a defendant's home, through an illegal search warrant, may such evidence be used against him upon a trial for a criminal offense? The question is one of great importance. It has been raised in almost every jurisdiction in the country, and the decisions are in hopeless conflict. The federal courts, followed by some nineteen of the states, hold that such evidence is not admissible, while the courts of twenty-three of the states hold it is. The question has previously been raised in this court, but we have always expressly reserved a decision on the issue. *Thompson* v. *State,* 41 Ariz. 167, 16 Pac. (2d) 727; *Malmin* v. *State,* 30 Ariz. 258, 246 Pac. 548. Under these circumstances, it cannot be said that any rule has been definitely established by the great weight of authority, and we think we should examine the question as one of first impression.

Defendant bases his contention upon the Fourth and Fifth Amendments to the Constitution of the United States, which read respectively, so far as material, as follows:

"(Unreasonable searches and seizures.) The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be seized.''

''(Criminal actions—Provisions concerning—Due process of law and just compensation clauses.) No person . . . shall be compelled in any criminal case to be a witness against himself, . . . ''

The rights which these two Amendments attempt to protect come down to us from time immemorial through the common law of England, and their general principles have been set forth in the case of *Entick* v. *Carrington,* 19 Howell's State Trials, 1030, 1066, 1074, as follows:

''The great end, for which men entered into society, was to secure their property. That right is preserved sacred and incommunicable in all instances, where it has not been taken away or abridged by some public law for the good of the whole. . . . By the laws of England, every invasion of private property, be it ever so minute, is a trespass. . . .

''According to this reasoning, it is now incumbent upon the defendants to shew the law, by which this seizure is warranted. If that cannot be done, it is a trespass.

''Papers are the owner's goods and chattels; they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer, there is none; and therefore it is too much for us without such authority to pronounce a practice legal, which would be subversive of all the comforts of society.

'' . . .

''Lastly, it is urged as an argument of utility, that such a search is a means of detecting offenders by discovering evidence. I wish some cases had been

shewn, where the law forceth evidence out of the owner's custody by process. . . .

"It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle. There too the innocent would be confounded with the guilty."

This language has been quoted repeatedly with approval by the courts of this country and the general principles thus stated have never been questioned. It is the application of these principles with which we are concerned. The English courts, following the decision in *Entick* v. *Carrington, supra,* have always upheld the doctrine laid down therein, but so far as we are advised they have never thought that it followed therefrom that evidence obtained by an illegal seizure was not admissible against a defendant. On the contrary, whenever the question was raised, they have held that if the evidence was otherwise competent the court would not look into the question of how it was secured. *Atterbury's Case,* 16 Howell's State Trials, 324; *Phelps* v. *Prew,* 118 Eng. Reprint 1203; *Jordan* v. *Lewis,* 93 Eng. Reprint 1072; *Legatt* v. *Tollervey,* 104 Eng. Reprint 617. The last case is of particular interest because it points out one of the remedies for a violation of the principle involved, which is seldom invoked or even recognized by the American cases. Apparently the English rule was followed in practically every jurisdiction in this country for many years, it being assumed that the invasion of premises without a proper search warrant gave rise to an action for damages for trespass against the offending parties, but that the evidence obtained by such a warrant, if otherwise competent, was admissible. In 1885, however, the Supreme Court of the United States, in the case of *Boyd* v. *United*

*States,* 116 U. S. 616, 6 Sup. Ct. 524, 532, 29 L. Ed. 746, 751, 752, laid down a different rule for the federal courts, and since it is on this famous case that practically every decision denying the admission of evidence thus obtained is based, we think it advisable to discuss it at some length.

The factual situation was as follows: An information was filed in the case by the United States to confiscate certain goods alleged to have been illegally imported and it became important to show the quantity and value of the property. The United States applied for an order commanding the defendants to produce the invoice of certain imported property of a similar nature. The defendants, in obedience to the order, did produce the invoice but objected to its admissibility on the ground that the admission, under the circumstances, violated the Fourth and Fifth Amendments to the Federal Constitution. Whether it did or did not was the principal question raised and determined on the appeal. The court went into the whole history of the Fourth Amendment, referring with approval to *Entick* v. *Carrington, supra,* quoting liberally therefrom, and then said:

"The principles laid down in this opinion affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employes, of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property, where that right has never been forfeited by his conviction of some public offense,—it is the invasion of this sacred right which underlies and constitutes the essence of Lord Camden's judgment. Breaking into

a house and opening boxes and drawers are circumstances of aggravation; but any forcible and compulsory extortion of a man's own testimony, or of his private papers to be used as evidence to convict him of crime, or to forfeit his goods, is within the condemnation of that judgment. In this regard the fourth and fifth amendments run almost into each other.

"Can we doubt that when the fourth and fifth amendments to the constitution of the United States were penned and adopted, the language of Lord Camden was relied on as expressing the true doctrine on the subject of searches and seizures, and as furnishing the true criteria of the reasonable and 'unreasonable' character of such seizures?

" . . .

"We have already noticed the intimate relation between the two amendments. They throw great light on each other. For the 'unreasonable searches and seizures' condemned in the fourth amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the fifth amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the fifth amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the fourth amendment. And we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself. . . . "

We have the highest respect for the distinguished court which enunciated the rules set forth above, but we think certain fallacies appear in the reasoning and language of the case. It holds very specifically that when one's private books and papers are seized against his consent, their use in a criminal trial, in effect, compels him to be a witness against himself, contrary to the Fifth Amendment, and that the Fourth and Fifth Amendments are, in effect, based

upon the same principle and necessarily *in pari materia.*

Careful examination of the history of the principles involved in these amendments, the one relating to unlawful search and seizure and the other prohibiting compulsory self incrimination, shows that they came into the common law at different times and entirely independent one of the other, and that the principles are in no way necessarily connected. If certain evidence violates the right against self incrimination, it can make no possible difference, so far as that right is concerned, whether it was obtained by a lawful or unlawful search and seizure, and any inquiry into the method by which it was secured, except to determine whether it was against the consent of defendant, is irrelevant and immaterial. On the other hand, in determining whether a search and seizure was reasonable or not, the character of the evidence obtained as being self incriminating or not does not affect the validity of the search or seizure. If the conclusion in *Boyd* v. *United States, supra,* that a man's private papers secured against his will are necessarily self incriminating, then, even though they be secured by virtue of a perfectly valid and proper warrant, they are none the less within the prohibition of the Fifth Amendment.

In the case of *Adams* v. *New York,* 192 U. S. 585, 24 Sup. Ct. 372, 375, 48 L. Ed. 575, 580, the same court which determined *Boyd* v. *United States, supra,* later held that private papers found in the execution of a legal search warrant might be used in evidence against a defendant without violating either the Fourth or Fifth Amendments, saying:

" . . . but the question solely was, Were the papers found in the execution of the search warrant, which had a legal purpose in the attempt to find gambling paraphernalia, competent evidence against the

accused? We think there was no violation of the constitutional guaranty of privilege from unlawful search or seizure in the admission of this testimony. Nor do we think the accused was compelled to incriminate himself. He did not take the witness stand in his own behalf, as was his privilege under the laws of the state of New York. He was not compelled to testify concerning the papers or make any admission about them.

"The origin of these amendments is elaborately considered in Mr. Justice Bradley's opinion in the *Boyd Case,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746. The security intended to be guaranteed by the 4th Amendment against wrongful search and seizures is designed to prevent violations of private security in person and property and unlawful invasion of the sanctity of the home of the citizen by officers of the law, acting under legislative or judicial sanction, and to give remedy against such usurpations when attempted. But the English, and nearly all of the American, cases, have declined to extend this doctrine to the extent of excluding testimony which has been obtained by such means, if it is otherwise competent. In Boyd's Case the law held unconstitutional virtually compelled the defendant to furnish testimony against himself in a suit to forfeit his estate, and ran counter to both the 4th and 5th Amendments. The right to issue a search warrant to discover stolen property or the means of committing crimes is too long established to require discussion. The right of seizure of lottery tickets and gambling devices, such as policy slips, under such warrants, requires no argument to sustain it at this day. But the contention is that, if, in the search for the instruments of crime, other papers are taken, the same may not be given in evidence. As an illustration,—if a search warrant is issued for stolen property, and burglars' tools be discovered and seized, they are to be excluded from testimony by force of these amendments. We think they were never intended to have that effect, but are rather designed to protect against compulsory testimony from a defendant against himself in a criminal trial, and to punish wrongful invasion of the home of the citizen or the unwarranted seizure

of his papers and property, and to render invalid legislation or judicial procedure having such effect.''

This was, in effect, although not in specific words, a repudiation of the doctrine laid down in *Boyd* v. *United States, supra,* and an adoption of the English rule. Later the case of *Hale* v. *Henkel*, 201 U. S. 43, 26 Sup. Ct. 370, 378, 50 L. Ed. 652, 665, was decided by the same court, and the Boyd and Adams cases, *supra,* were discussed, the court saying:

''We think it quite clear that the search and seizure clause of the 4th Amendment was not intended to interfere with the power of courts to compel, through a *subpoena duces tecum,* the production, upon a trial in court, of documentary evidence. As remarked in *Summers* v. *Moseley*, 2 Cromp. & M. 477, it would be 'utterly impossible to carry on the administration of justice' without this writ. The following authorities are conclusive upon this question: [citing cases].''

We think it is clear that the supreme court has in its later cases repudiated the idea that the use of evidence such as papers and other physical exhibits owned by a defendant and taken from him against his will violates the Fifth Amendment. This, however, does not have any effect upon its ruling, which has been followed with reasonable consistency since *Boyd* v. *United States, supra,* that the Fourth Amendment prohibits the use of evidence of the nature referred to which was illegally seized against the will of the defendant. We, therefore, consider the rationale of the principles on which that Amendment is obviously based. The answer is plain. It is the protection of the individual citizen against an unlawful trespass on his home and property rights as set forth in *Entick* v. *Carrington, supra,* and not the protection of a criminal against the use of evidence otherwise competent. The English courts and the earlier American decisions recognized this and

pointed out an appropriate and adequate remedy for its violation. It is the punishment of the person who violates it and not the freeing from liability for some crime unconnected with the unlawful search of the one whose rights have been violated. The English courts and the courts of our own nation hold that an action for damages always lies against the one responsible for the unlawful search and seizure. It is also indicated in *Legatt* v. *Tollervey, supra,* and we think correctly, that if the violator is an officer of the court he may be punished by the court as for a contempt. The only reason it is claimed that in addition the evidence thus obtained must be suppressed is that these two remedies are not sufficient to deter an officer from the illegal search or seizure and that in addition thereto he must be told that his acts will be futile, for the evidence he obtains cannot be used. If punishment by a money judgment, and perhaps fine and imprisonment, will not deter the officer from the illegal search and seizure, we think it extremely doubtful whether the additional penalty of seeing a third person escape from a just sentence will have that effect. The illustration given by Professor Wigmore in 4 Wigmore on Evidence, section 2184, well shows the logical absurdity of excluding the evidence so obtained:

" . . . The natural way to do justice here would be to enforce the splendid and healthy principle of the Fourth Amendment directly, i. e. by sending for the high-handed, over-zealous marshal who had searched without a warrant, imposing a thirty-day imprisonment for his contempt of the Constitution, and then proceeding to affirm the sentence of the convicted criminal. But the proposed indirect and unnatural method is as follows:

" 'Titus, you have been found guilty of conducting a lottery; Flavius, you have confessedly violated the constitution. Titus ought to suffer imprisonment for

crime, and Flavius for contempt. But no! We shall let you *both* go free. We shall not punish Flavius directly, but shall do so by reversing Titus' conviction. This is our way of teaching people like Flavius to behave, and of teaching people like Titus to behave, and incidentally of securing respect for the Constitution. Our way of upholding the Constitution is not to strike at the man who breaks it, but to let off somebody else who broke something else.' ''

No innocent party need fear the effect of the use of evidence against him illegally obtained, while the invasion of his right to be free from illegal trespass will be avenged by a judgment in damages, and, if the court having jurisdiction of officers committing the offense does its duty in cases where the violation was willful and intentional, by punishment for contempt. On the other hand, even the guilty criminal against whom the evidence is used has the same remedies for an illegal trespass, but should not be given, in addition, immunity for some other breach of the law. The constitutional provision was not meant to assist a guilty criminal in escaping the penalty for his misdeeds, but to protect certain rights belonging to all men alike, and the remedies applied should recognize this principle. We hold, therefore, that in determining the admissibility of evidence the fact that it has been obtained as the result of a violation of the Fourth Amendment does not affect the issue.

The judgment is affirmed.

McALISTER and ROSS, JJ., concur.