461 P.2d 488

The STATE of Arizona, Appellee,

v.

Mary Jane BRADY, Appellant.

No. 1974.

Supreme Court of Arizona.

In Banc.

Nov. 13, 1969.

Gary K. Nelson, Atty. Gen., Carl Waag, Asst. Atty. Gen., for appellee.

Wilson, Compton & Egan, by William M. Egan, Flagstaff, for appellant.

McFARLAND, Justice.

Mary Jane Brady, hereinafter referred to as defendant, was charged in Coconino County with the crime of murder in the first degree; was tried on two counts in the killing of William Kent Mackelprang and Anthony Mackelprang, hereinafter referred to as Kent and Tony or the decedents. She was tried and convicted on both counts of second-degree murder, and sentenced to serve not less than ten nor more than twenty years in the Arizona State Prison on each of the counts; the sentence under Count II to run consecutively with the sentence on Count I. From the judgment and sentence of the court she appeals.

Defendant was single, thirty-four years of age at the time of the trial, weighed around 110 or 115 pounds, and was born in New York. She had completed high school, had come to Arizona in 1955, and attended the University of Arizona for practically one semester. After leaving school she had been employed in various capacities, including waitress work, "work with race horses, and wrangling dudes." She worked with race horses in the year 1956, and it was at the race track in 1957 in Kanab, Utah, that she met William J. Mackelprang, the father of Kent and Tony, the deceased brothers.

She entered into a contract with William J. Mackelprang to run his ranches—one in Utah, and one in Arizona; the one in Utah being located at Johnson Canyon, and the other was the Mackelprang allotment in House Rock Valley, the latter being referred to as the Bean Hole Ranch. She started to live at the Bean Hole Ranch exclusively in 1962. During this time she became acquainted with the deceased brothers, Kent and Tony. Her agreement called for payment in shares of the father's livestock (cattle, horses, and sheep) for her services as foreman.

The father at a later date had turned the ranch over to Kent, but testified that he did not *give* it to his son. The father testified that the reason for turning the ranch over to Kent was that he had been told that Jeff, an older son who had purchased the Utah property from his father, was going to sue him and his wife for the amount due on a mortgage on the property at the time of the sale—that it was for this reason that he had conveyed the property to Kent with the understanding that Kent would, upon request, reconvey the property to him. He testified that he had conveyed forty acres of State-leased land at the Arizona ranch to defendant, and that he had also transferred to her some of the livestock.

There had been some misunderstandings and arguments between defendant, Kent, Tony, and the family in regard to the refusal of Kent to reconvey the property. The father stated that he had gone to an attorney in regard to getting the property

reconveyed. The defendant had been given notice by an attorney for Kent to vacate the property, and had received eviction papers before the incident of the killing.

According to the testimony, on January 1, 1968, Kent, Tony and their families, started from Page to the Bean Hole Ranch for the purpose of feeding the cattle some hay. It was in Northern Arizona about 160 miles north of Flagstaff on the North Rim of the Grand Canyon, and cold, with approximately a foot and a half of snow on the ground. They turned around and left the children with Joyce, Tony's wife, and thereafter the three of them—Kent, Tony, and Jean (Kent's wife)—went to the ranch. There was contradictory testimony as to what happened when they arrived at the ranch. Defendant testified that she shot the two brothers because she was "scared." She testified of prior difficulty and prior threats, and her testimony in regard to threats was corroborated in part by testimony of the father.

The incidents of the threats were described as occurring in December and on July 4th previous to the happening on January 1st. Present at the July incident were the father, Jean, Kent, Tony, Joyce, and the defendant. There had been some drinking, and defendant referred to the father as the "old man," at which time Tony whirled and said: "You call my father an old man, I am going to kill you, you son of a bitch." Defendant testified that Tony then grabbed her with both hands and started choking her. In regard to the December incident, defendant testified that Kent, Tony, and Jean were at the ranch when Kent threatened her and gave her until the following Friday at sundown to get off the ranch—that Tony had told her that if she didn't get off they were going to donate a plot for her for her own—that Jean had also entered into the conversation but had merely repeated what Tony and Kent had said. It was on that evening that she stated she wrote a letter and will which were later introduced in evidence. In the letter which was sent to her sister she stated that she had

twelve years' wages coming and "I'll be damned if I'll give it to a couple of cattle rustlers without a fight." Then the letter described her version of the December incident she had testified to in her appearance in court.

In her testimony Jean Mackelprang supported the State's theory of the case that defendant was guilty of the charge of murdering Kent and Tony, and described in detail how defendant had shot them without provocation while they were feeding the cattle. Defendant's version was that she shot them "because she was scared." The evidence showed that neither of the decedents was armed, or that they attempted in any way to use a gun. The defendant, after the incident, drove to Flagstaff, throwing the gun out at the crossing on leaving the ranch, and gave herself up in Flagstaff. Jean managed to walk out to the highway from the ranch, caught a ride, and told of the killing. Officers of Coconino County were notified.

Defendant presented four questions in which she contends the court erred during the trial and in the sentence. One, the court erred in admitting the rifle used in the killing in evidence, stating that it was an admission on the part of the defendant made prior to being "advised of her rights pursuant to the Miranda warning." Second, the court erred in allowing the State to introduce color slides—that such pictures emphasized the blood to excite the passion and prejudice of the jury. Third, the trial court erred in failing to instruct the jury on voluntary and involuntary manslaughter. Fourth, the sentence was excessive, and therefore in violation of defendant's constitutional rights.

The court based its ruling upon the admissibility of the rifle on two separate findings. First, as stated:

"However, to reiterate the finding of the Court heretofore expressed, the Court does again make a specific finding that the statement of the accused to the arresting officer reference Exhibit 27 was completely spontaneous and volun-

teered and is not within the restrictions of Miranda.

"Further, that the statement is under our historical requirements of voluntariness a completely voluntary statement."

This finding of the court is supported by the evidence, and in accordance with the holdings of this Court in State v. Franklin, 104 Ariz. 324, 452 P.2d 498. When the defendant first went to Flagstaff she testified that she visited several bars. The arresting officer, Joe Garcia, Deputy Sheriff, testified:

"Q And then what happened?

"A So I left the Rose Tree Bar. I was going to check Club 66 and it was closed, so I was looking at the pickup very fine, the description and the license. About that time, Miss Brady come around the corner and approached me.

"Q And then what happened?

"A She asked me something to the effect like 'I guess you're looking for the driver of this vehicle?' I said, 'Yes, we are,' and she says, 'Well, you've found her. I'm the one you want.'

"Q What did you do then?

"A I said, 'All right, put your hands on the wall,' which she did. My first concern was they had told me she was armed. I didn't know what with, whether it was a pistol, knife or what. I didn't know.

"She had a loose fitting jacket, so I checked in the pockets for weapons first. At that time she said, 'If you're looking for the rifle,' I believe, or the 'gun, I threw it by the cattle guard by where it happened.' I said, 'Ma'am, you're under arrest for homicide. Please don't say anything to me at all because anything you say to me will be held against you in a Court of law.'

"Q Was Deputy Parker present when this happened?

"A Yes.

"Q How close was she to you when she first spoke to you?

"A Just the width of the sidewalk, whatever it is; three or four feet, I guess.

"Q When was it that you placed her under arrest with the words 'You're under arrest?'

"A Just shortly after I told her to put her hands on the wall.

"Q Was it before or after the statement that she made?

"A It was almost simultaneously, about the time I started to say, 'You're under arrest.'

"Q You indicated you were searching her for weapons?

"A Yes."

At no time in the testimony did defendant deny the statement made by the officer. She testified in her direct testimony:

"Q What were you drinking at the El Patio Bar?

"A I believe whiskey.

"Q What did you do after that?

"A Well, I—after I had been in there, I decided I was going to come up to the jail house, started down the street, and I was pretty well lit by then, went across the street over—I guess it's the 66 that's on that corner. I decided I'd have me one more drink before I come up. I walked in there and had a drink and I came back to the door. I looked across the street and there was four or five green county cars, police cars that was over on that corner.

"Q Where was your truck or the truck that you had at that time?

"A It was parked right there on that corner where these police cars were.

"Q What did you do Jerry?

"A Well, there was one policeman standing there on the sidewalk in front of these cars and I went—I went back across the street and walked up to him and I said, 'I guess you're looking for me.'

"Q  Did he answer?

"A  He stood there a minute. He grabbed me by the arm and whirled me towards the wall and that was it.

"Q  Do you remember anything else after that?

"A  I don't remember coming up to the jail, no."

She also testified at the hearing on the admissibility of the gun in evidence out of the presence of the jury as follows:

"Q  Mary Jane, you've heard Officer Garcia's testimony here this morning, is that correct?

"A  That's correct.

"Q  Do you recall the incident at the time you were arrested?

"A  I recall walking up to the officer.

"Q  Was Officer Garcia the officer you walked up to?

"A  No. It was they—there was one officer standing there all by himself and he was a big fellow and he had a white crash helmet on. He didn't have any glasses.

"Q  Was there any other officers present?

"A  Not at that time.

"Q  Do you recall what happened when you walked up to him?

"A  I said to him, 'I guess you're looking for me.' He stood there for a minute then grabbed me by the arm and wheeled me towards the wall and that's the last I remember.

"Q  Do you recall making any statements concerning where they could find the rifle?

"A  I don't remember talking to them.

"Q  What's the next time you can recall?

"A  The next thing I remember, I was sitting somewheres near a desk . * * * "

It is clear from this testimony that the statement of defendant falls clearly within the scope of the holdings in State v. Franklin, supra, where we passed upon a similar question. Quoting testimony, we said:

"'A.  After throwing the gun down he said, "Go ahead and burn me, go ahead and burn me," and after repeating this, made the statement, "for a lousy fifteen minutes it is going to cost me years. All I wanted was some money." And he went on to say that he went into the market to use the restroom, and he saw the money and he couldn't resist taking it, and he needed it for his family.

"'Q.  Now, at any time before or during the time he made these statements you have just testified to, did you attempt to question him in any way or ask him any questions?

"'A.  No.

\* \* \* \* \* \*

"'Q.  And you didn't advise him at that time he didn't have to make any statement to you whatsoever, did you?

"'A.  I didn't have a chance to. He kept talking.'

"The obvious outburst of the defendant does not fall within the prohibitions of Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The testimony shows that no questions were asked by the officer at the time of the arrest nor was he afforded an opportunity to give Miranda warnings prior to the defendant's utterances. Having held the arrest to be lawful, we find no error in admitting the statements of the defendant."

■ In the instant case the defendant was in custody when she made the statement. In fact, the taking into custody and the statement occurred almost simultaneously without any opportunity to give the Miranda warning. Officer Garcia was not attempting to interrogate the defendant, but, rather, at this point, because he had been told "she was armed," in the interest of the safety of himself and his fellow officer, he had commenced to search the suspect who he believed to be armed. We see no difference between this situation and the

examples of admissible statements set forth in Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694, where the United States Supreme Court said:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

"To summarize, we hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way *and is subjected to questioning,* the privilege against self-incrimination is jeopardized.

\* \* \* \* \* \*

"\* \* \* He must be warned *prior to any questioning* that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. \* \* \*". Id. at 384 U.S. 478, 86 S.Ct. 1630, 16 L.Ed.2d 726 [Emphasis added.]

See also, Bowman v. Peyton, 287 F.Supp. 863 (W.D.Va.); People v. Savage, 102 Ill. App.2d 477, 242 N.E.2d 446; Priestley v. State (Wyo.), 446 P.2d 405; Cook v. State (Fla.App.), 219 So.2d 468 (per curiam). Second, the prosecution was unwilling to rely solely upon this holding of the court,

and insisted that the court make a specific finding in regard to whether the weapon was found independent of these statements. The court made such a finding.

The testimony was to the effect that the officer had made a report of the defendant's statement as to what she did with the gun. The investigating officer testified that he found the rifle stuck in the snow, a small portion of the stock or most of it sticking out of the snow; that it was a short distance off the road on the left side; that it was between three and a half and four miles from the Bean Hole Ranch right close to Highway 89A; that this was on the Bean Hole Road going out to the highway. The court, in making its finding, stated:

"Well, I mean you used the point that I cannot do so. I think under any circumstances it would be a question of law for the Court.

"If I recall the testimony of Mr. Kofford, it was to the effect that it was found about ten feet off the main road sticking out of the snow. Isn't this now what the evidence reflects?

\* \* \* \* \* \*

"Well, of course, he already had knowledge of the fact that there was a rifle. It would have been searched for in any event, I'm sure.

\* \* \* \* \* \*

"I think the fact that it's, of course, a situation where the officer would have searched for the rifle, he knew that it was taken from the ranch. I think the search would be independent of the statement under circumstances would have been found in any event. [sic] I think I can make such a finding.

"Is there anything further before we call the jurors back?"

The holding of the court on the admissibility of the evidence on the second ground is supported by the case cited by the trial court. State v. Taylor (Mo.), 421 S.W.2d 310, cert. den. 393 U.S. 880, 89 S.Ct. 182, 21 L.Ed.2d 153. Also see Toohey v. United

States, 9 Cir., 404 F.2d 907; People v. Soto, 55 Misc.2d 219, 285 N.Y.S.2d 166.

■ Furthermore, there is a third answer to the contentions of defendant in regard to the admissibility of this evidence. This Court has held many times that in order to justify a reversal an error must be prejudicial under the facts of the case. The test is whether there was reasonable probability under such facts that a verdict might have been different had the error not been committed. State v. Ybarra, 97 Ariz. 200, 398 P.2d 905; State v. Dutton, 83 Ariz. 193, 318 P.2d 667; State v. Thomas, 79 Ariz. 355, 290 P.2d 470; State v. Polan, 78 Ariz. 253, 278 P.2d 432; State v. Singleton, 66 Ariz. 49, 182 P.2d 920. The admission of the rifle could not have been prejudicial error under the facts of the instant case. According to all of the testimony—including that of the defendant—she had used a rifle in the killing of the decedents. There was no question about the kind of weapon that was used, and there was no question that the defendant had used the rifle.

We therefore hold that the admission of the rifle in evidence—even if improper— was not prejudicial error under the facts of the instant case.

■ The next contention is that the court erred in permitting the State to introduce color slides instead of black-and-white pictures. This Court has spoken upon the introduction of pictures in a number of cases. The principle of law governing the admissibility of photographs in evidence is set forth in State v. Goodyear, 98 Ariz. 304, 316, 404 P.2d 397, 405–406, reversed on other grounds, 100 Ariz. 244, 413 P.2d 566, where we said:

"Defendant Goodyear assigns as error the introduction of photographs and other exhibits which he states are of a gruesome nature, and were introduced for the sole purpose of arousing the emotions of the jury and prejudicing defendant. The photos objected to number twenty-two in all. They show the body of the deceased from various angles as it was found lying just off the Flux Canyon Road. There are four photos showing the remains of deceased as they lay in the morgue. These four show where the bullets entered the body of the deceased. There are also photos showing where the hands had been severed from the arms. Another was taken from the back showing the absence of the hands. Other pictures show the house where defendants were living.

    \*     \*     \*     \*     \*     \*

"Other cases hold that photographs are admissible for the purposes set forth in Barker, supra, and for the purpose of showing the wounds that caused the death and corroborating the state's theory of when and how the murder was committed. State v. Frye, 58 Ariz. 409, 120 P.2d 793; Burgunder v. State, 55 Ariz. 411, 103 P.2d 256; Young v. State, 38 Ariz. 298, 299 P. 682.

"The trial court in its discretion found that the photographs had a probative value, and were admissible. We hold the trial court did not abuse its discretion in admitting these exhibits."

■ The question of the admissibility of the evidence is whether it has probative value. The same principle applies whether the pictures are in black and white or in color. Under the evidence of the instant case, the photographs were clearly admissible.

■ The next contention of the defendant is that the court erred in failing to instruct on voluntary and involuntary manslaughter. This Court has repeatedly held that an instruction on a lesser offense is justified only when there is sufficient evidence upon which the jury could convict for the lesser offense. This principle of law is succinctly set forth in State v. Schroeder, 95 Ariz. 255, 389 P.2d 255, cert. denied 379 U.S. 939, 85 S.Ct. 347, 13 L.Ed. 2d 350, in which we held:

"Under our holdings, instructions on lesser offenses are justified only when there is evidence upon which the jury could

convict of a lesser offense and, at the same time, find that the state had failed to prove an element of the greater crime. Application of Williams, 85 Ariz. 109, 333 P.2d 280 (1958); Antone v. State, 49 Ariz. 168, 65 P.2d 646 (1937). In other words, the state of the record must not be such that defendant can only be guilty of the crime charged or not guilty at all. When the sole defense to a charge of murder is an alibi, for example, or a plea of insanity, no instruction on included crimes is necessary. For in these cases, if the jury accepts defendant's version of the killing, they must acquit; if not, and the state's proof is otherwise sufficient, the only alternative is conviction of the offense charged. [Cases cited.]"

See also: State v. Sorensen, 104 Ariz. 503, 455 P.2d 981; State v. Madden, 104 Ariz. 111, 449 P.2d 39.

■■■ It was the contention of the defendant that she was acting in self-defense. In support of this contention, she testified to threats and introduced a letter which she had written to her sister. Her testimony was to the effect that she shot both the brothers because she "was scared." A.R.S. § 13–456 defines voluntary manslaughter as "upon a sudden quarrel or heat of passion." Clearly, the evidence would not support voluntary manslaughter, as there was no evidence whatsoever that the killing was upon a sudden quarrel or heat of passion. As a matter of fact, it was just the opposite. The defendant, in support of her self-defense contention, testified to difficulties which had occurred on previous occasions and in her letter, submitted for the same purpose stated that Tony Mackelprang had tried to kill her "a few months ago"; also that "I'll be damned if I'll give it to a couple of cattle rustlers without a fight." From this evidence the jury could have found malice aforethought, but not evidence of a sudden quarrel or heat of passion.

■■■ As to involuntary manslaughter, there is no evidence from which a jury could find that the decedents were killed "in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death in an unlawful manner," as defined in § 13–456, A.R.S. It was proper for the court to refuse the instruction on manslaughter. State v. Sorensen, supra; and State v. Madden, supra.

■■■ The defendant contends that the sentence of the court was excessive, and requests this Court to modify the same. The sentence being within the statutory limits, we find nothing to justify a modification. State v. Bradley, 99 Ariz. 328, 409 P.2d 35; and State v. Vineyard, 96 Ariz. 76, 392 P.2d 30.

Judgment affirmed.

UDALL, C. J., LOCKWOOD, V. C. J., and STRUCKMEYER and HAYS, JJ., concur.