NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

LUIS RAUL CARDONA RODRIGUEZ, *Appellant*.

No. 1 CA-CR 14-0197
FILED 4-14-2015

Appeal from the Superior Court in Maricopa County
No. CR2013-438080-001
The Honorable Jeffrey Rueter, Judge *Pro Tem*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Maricopa Office of the Legal Advocate, Phoenix
By Frances J. Gray
*Counsel for Appellant*

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which Presiding Judge Kent E. Cattani and Judge Peter B. Swann joined.

**W I N T H R O P**, Judge:

¶1        Luis Raul Cardona Rodriguez ("Appellant") appeals his conviction and sentence for aggravated assault, arguing the trial court committed fundamental, reversible error by not *sua sponte* instructing the jury on the use of force in crime prevention as a possible justification for his actions.  *See* Ariz. Rev. Stat. ("A.R.S.") § 13-411 (West 2015).[1]  For the reasons set forth below, we affirm.

**FACTS AND PROCEDURAL HISTORY[2]**

¶2        On August 20, 2013, a grand jury issued an indictment, charging Appellant with aggravated assault, a class three dangerous felony in violation of A.R.S. §§ 13-1203 and 13-1204.  The State alleged Appellant had used a shovel to physically injure the victim, and the offense was dangerous because it involved the use of "a deadly weapon or dangerous instrument and/or the intentional or knowing infliction of serious physical injury upon [the victim]."  The State later alleged Appellant had one non-dangerous historical prior felony conviction, and also alleged the presence of several aggravating circumstances.

¶3        At trial, the State presented the following evidence:  In August 2013, C.D. and J.D. lived in a house at the front of a lot, and the victim lived in a house in the back.  Appellant would often pass by the houses and request change or a glass of water.

¶4        On the evening of August 9, the victim washed his car and was about to clean the car's windows when Appellant approached and

---

[1]        We cite the current version of the statutes unless changes material to our decision have occurred since the date of the crime.

[2]        We view the facts in the light most favorable to sustaining the verdict and resolve all reasonable inferences against Appellant.  *See State v. Nihiser*, 191 Ariz. 199, 201, 953 P.2d 1252, 1254 (App. 1997).

offered to clean the windows in exchange for food. After Appellant cleaned the windows, the victim drove Appellant and a neighbor to a nearby restaurant and purchased dinner for the group. Appellant said he would return the next day to wash the victim's truck.

¶5        The next day, the victim began some work on his driveway when his neighbor, J.D., came outside and said, "Why don't you leave that? Today is a day to rest." The two men sat in the driveway and began drinking; J.D. drank a bottle of whiskey, and the victim drank beer and shots of Tequila.[3] At some point, the victim went into his house and brought out a small kitchen knife to cut some lemons or limes for his drinks. Sometime between 3:00 and 5:00 p.m. – long after the victim and J.D. had begun drinking – Appellant came by and requested a beer. The victim gave Appellant a beer, but stated he no longer wanted Appellant to wash his truck that day because it was late in the afternoon and he "didn't really feel like pulling out the hose and the soap and all of that."

¶6        Later that evening, the victim entered his house to use the bathroom and, when he came out, Appellant and J.D. were arguing. J.D. threatened "to whop [Appellant's] ass." Appellant picked up the kitchen knife the victim had been using, and J.D. brandished a knife he carried with him. The victim stood between them, told J.D. to "calm down," and asked Appellant to leave. J.D. agreed to "let it go" and, according to the victim, Appellant left.[4]

¶7        The victim and J.D. continued drinking for another couple of hours, until it was "pretty late," before they went into their respective houses. J.D. eventually went to bed and fell asleep.

¶8        Approximately an hour and a half after he went into his house, the victim was on his cellphone talking to an ex-girlfriend, when he looked out the window and noticed his gate was open. He advised his ex-girlfriend he would call her back and went outside to close the gate.

¶9        Appellant was lurking next to the victim's car in the driveway and accosted the victim. Appellant demanded money, but the victim refused because he had no money. The victim's cell phone rang, and as he

---

[3]        Another neighbor briefly joined J.D. and the victim, but then left for a family party.

[4]        J.D. testified Appellant continued to "hang around" for at least a couple of hours after being told to leave.

turned and answered the phone, Appellant struck the side of his head with a shovel. The victim dropped his cell phone and fell to the ground. Appellant exclaimed, "You fucking dog. You called the police," and struck the victim on the nose with the shovel. As Appellant repeatedly struck him with the shovel, the victim attempted to pull himself up by the car's door handle, but Appellant would not let him get up, shouting, "Die[,] you fucking dog." The victim yelled for J.D., but Appellant threatened, "Don't call anyone, you fucking dog." Appellant hit the victim in the face with the shovel and pushed the shovel into the victim's mouth, chipping a tooth and knocking out one of the victim's back teeth.

¶10 Meanwhile, C.D. had been awakened by a scraping noise on the side of her house, and she went outside to investigate. As she went out the front door, she heard the victim crying out for J.D., and saw Appellant hitting the victim in the head with a shovel. Appellant saw C.D., dropped the shovel, and ran. C.D. ran to the victim, saw blood on him, and began screaming. J.D. was awakened by C.D.'s screams, went outside, saw the victim lying on the ground and bleeding profusely, and also began screaming. C.D. called 911.

¶11 Phoenix police officers arrived a few minutes later. Sergeant Miaso arrived first and observed J.D. standing in the street flailing his arms around and yelling. Officer Roberts also arrived and observed that the victim's face and shirt were "all bloody." The victim sat on the sidewalk and explained to Officer Roberts that someone named Luis had asked him for money and then hit him with a shovel. The victim also kept repeating, "He tried to kill me."

¶12 Sergeant Miaso observed a truck parked in front of a car in the driveway, and a trail of blood to the south of the vehicles. A "square mouth shovel that had blood on the end of it, on the shovel part of it" was on the ground near the vehicles, and there was a substantial amount of blood on the ground and on the side of the car. Officers searching the area found no other weapons of any kind.

¶13 Paramedics arrived and treated the victim, who was bloody and had significant head injuries. The victim had a severe laceration to the left side of his head at least three inches long; an inch-and-a-half laceration across the bridge of his nose, "almost as if his nose was cut in half"; and a three-inch laceration to his left ear, such that the ear was "pretty much split off" and cut "in half." He also had lacerations to his left shoulder, his right chest, and across his stomach, and cuts and contusions to his back. After

treating the victim's wounds, the paramedics transported him to the hospital.

¶14 While other police officers were responding to the scene of the crime, Officer Werner had obtained a description of the suspect and his last known direction of travel. As Officer Werner drove in that direction in a marked police vehicle, he observed a person matching the description of the suspect turn west onto Brill Street. Officer Werner turned onto the street and saw the person, later determined to be Appellant, walking in a dirt area between a wall and the sidewalk. Officer Werner shined his spotlight on Appellant, drove to within fifteen to twenty feet of him, and got out of his vehicle. Officer Werner, who was wearing his police uniform, identified himself as a Phoenix police officer, and told Appellant to come toward him. Appellant glanced in Officer Werner's direction, turned, and attempted to scale the wall, but was unable to do so despite repeated attempts. Officer Werner continued giving commands, which Appellant ignored.

¶15 Appellant eventually dropped down from the wall and began running westbound along the sidewalk. Officer Werner got back in his patrol vehicle, activated the emergency lights, illuminated Appellant with his spotlight, and pursued Appellant while radioing other police units in the area. The officer also lowered his windows, continued to shout commands, and utilized the "yelp" horn on his patrol vehicle, but Appellant kept running. As Appellant continued to run, the height of the nearby wall decreased from approximately eight to ten feet to only three to four feet, and Appellant jumped the wall, into a residential backyard. Officer Werner exited his patrol vehicle and chased Appellant, repeatedly identifying himself as a Phoenix police officer, and commanding Appellant to stop running.[5]

¶16 Appellant continued to flee, however, and eventually reached the back porch of a residence, where he attempted to open a set of double doors. Unable to do so, and with Officer Werner closing in on him, Appellant sat down on a nearby couch. Officer Werner held Appellant at gunpoint until other officers arrived, then arrested him.[6] Appellant had no injuries.

---

[5] Officer Werner testified that, in his opinion, Appellant's conduct suggested he knew he was being chased by a police officer.

[6] Appellant was arrested at 1:03 a.m.

¶17        Appellant elected to testify in his defense, and his account of the events differed significantly from that of the other witnesses. He stated he had lived in the neighborhood for more than ten years, and would often do odd jobs for the victim at the victim's request.[7] Appellant testified that, at approximately 7:00 p.m. on August 10, as he walked past the victim's house, the victim requested he help wash the victim's truck, and he agreed to do so. Over the next hour-and-a-half to two hours, Appellant cleaned the windows on the victim's truck and car, drank some beer offered to him by the victim, and then waited to be paid for the work.

¶18        Appellant asserted the altercation began when J.D. began insulting and yelling at him, and then pulled out a dagger or knife.[8] Appellant became scared and asked the victim for help, but the victim ignored him. Appellant tried to leave, but J.D. grabbed his hand, pulled him down onto a plastic chair, and threatened to kill him if he moved. The victim, who had been standing there the whole time, suddenly produced a sharp, two-foot machete, put it against the left side of Appellant's neck, and asked, "[W]hat do you think about this?"[9]

¶19        Appellant further testified the victim and J.D. threatened him for approximately thirty to forty-five minutes, until the victim's phone rang. The victim walked a couple feet away to talk, and J.D. simply went home without explanation. When asked why he didn't "just leave" at that point, Appellant answered, "Because I couldn't think and [the victim] has other weapons and he could shoot me, and I feared for my life at that time." Appellant then saw a shovel leaning against a wall approximately three or four feet away, grabbed the shovel, and struck the victim once in the chest with it "[s]o he would faint so I could run away and save my life." The victim, however, did not fall to the ground; instead, he dropped his cell phone and the machete, and grabbed the metal portion of the shovel. Appellant and the victim struggled for it briefly before the victim called for

---

[7]        Nevertheless, Appellant testified the victim had previously physically assaulted him.

[8]        Appellant initially testified he had never had any previous problem with J.D. Later, in answering a juror question, he stated J.D. had been aggressive toward him on approximately three previous occasions.

[9]        Appellant claimed he thought it was his "last moment" and he "couldn't do anything," in part because he has "a very delicate hernia" near his "private parts," which "would make being hit particularly bad."

J.D. C.D. and J.D. shouted at Appellant, who released the shovel, opened the nearby gate, and began running in an effort to save his life.

¶20    Appellant claimed he ran when Officer Werner drove up next to him because he didn't realize Werner was a police officer. Appellant denied hearing the officer shouting "stop, Phoenix police," hearing a siren or horn blowing, or seeing the vehicle's red and white flashing lights. When asked if he remembered running and trying to enter a house through a sliding door, Appellant answered, "It's my kid's house and I knocked on the door so that I could go in and tell him what happened and to call the police."[10]

¶21    The parties agreed on final jury instructions and verdict forms, which included defense counsel's proffered instruction regarding justification for self-defense. The court was not requested to and did not instruct the jury regarding use of force in crime prevention.

¶22    The jury found Appellant guilty as charged, including finding the offense was dangerous. After finding Appellant had one historical prior felony conviction, the trial court sentenced him to a presumptive term of 7.5 years' imprisonment, with credit for 215 days of presentence incarceration. This court has jurisdiction over Appellant's timely appeal. *See* Ariz. Const. art. 6, § 9; A.R.S. §§ 12-120.21(A)(1), 13-4031, 13-4033(A).

**ANALYSIS**

¶23    Appellant maintains the evidence presented supported a jury instruction on the use of force in crime prevention, *see* A.R.S. § 13-411, and argues the trial court committed fundamental, reversible error by failing to provide such an instruction. We disagree.

¶24    Appellant did not raise this issue before the trial court; accordingly, we review it only for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567-69, ¶¶ 19-26, 115 P.3d 601, 607-09 (2005); *see also* Ariz. R. Crim. P. 21.3(c) (providing that the failure to distinctly object to a court's giving or failing to give an instruction waives any objection thereto on appeal). To prevail under this standard of review, Appellant bears the burden of proving that error occurred, the error was fundamental, and the error caused him prejudice. *See Henderson*, 210 Ariz. at 567-69, ¶¶ 19-26, 115 P.3d at 607-09.

---

[10]    Appellant also admitted having a prior felony conviction.

¶25        "[A] trial court has a duty to instruct on the law relating to the facts of the case when the matter is vital to a proper consideration of the evidence, even if not requested by the defense and failure to do so constitutes fundamental error." *State v. Avila*, 147 Ariz. 330, 337, 710 P.2d 440, 447 (1985) (citations omitted).   To establish fundamental error, Appellant must show the error complained of goes to the foundation of his case, takes away a right essential to his defense, and is of such magnitude that he could not have received a fair trial. *Henderson*, 210 Ariz. at 567-68, ¶¶ 19, 24, 115 P.3d at 607-08 (citations omitted).

¶26        Even assuming *arguendo* the trial court erred in not giving a crime prevention instruction, Appellant fails to carry his burden of proving fundamental error under the facts and circumstances of this case. Appellant defended solely on the ground that he feared for his life and struck the victim with the shovel in self-defense.  He did not specifically notice crime prevention as a defense, and his counsel made clear throughout trial, including in opening and closing arguments, that Appellant's sole defense was self-defense.  Furthermore, the jurors were instructed:

> The use of physical force or deadly physical force is justified if a reasonable person in the situation would have reasonably believed that *immediate physical danger appeared to be present*.  Actual danger is not necessary to justify the use of physical force or deadly physical force in self-defense.

(Emphasis added.)  *See generally* A.R.S. §§ 13-404, -405.  If the jurors had believed Appellant's testimony, they would have necessarily concluded he faced an immediate threat of physical danger.  Appellant testified J.D. pulled out a foot-long "dagger" or knife approximately two to three inches wide with a blade on both sides, forced Appellant down onto a chair, held the dagger up to him, and "swore to God he would kill [Appellant]" if he tried anything.  Appellant claimed the victim then put a sharp, two-foot long machete against Appellant's neck.  Appellant told jurors, "I thought it was my last moment.  I was scared.  I couldn't do anything."  The victim "was to my left and [J.D.] was to my right."  According to Appellant, even after the victim answered his cell phone and J.D. simply went home, the victim was still armed with the machete, and Appellant grabbed the shovel and struck the victim once in the chest because he "feared for [his] life at that time."  Appellant concluded his testimony by telling the jurors, "To save my life I did what I had to do."  If the jury believed Appellant's account of the events, they would have acquitted him under either the self-defense or the crime prevention justification statute.  *See* A.R.S. §§ 13-404, -411.

Under the specific facts and circumstances of this case, any distinctions in the statutes are irrelevant. Thus, not giving a crime prevention justification instruction did not hamper Appellant's defense or go to the foundation of his case. *See Henderson*, 210 Ariz. at 567-68, ¶¶ 19, 24, 115 P.3d at 607-08 (citations omitted).

¶27 Appellant also fails to carry his burden of proving he was prejudiced. *See Henderson*, 210 Ariz. at 568–69, ¶ 26, 115 P.3d at 608–09. Prejudice results when an appellant shows there is a reasonable probability under the facts of the case that the verdict might have been different had the error not been committed. *State v. Brady*, 105 Ariz. 190, 196, 461 P.2d 488, 494 (1969). Appellant may not rely on mere speculation to demonstrate prejudice. *See State v. Munninger*, 213 Ariz. 393, 397, ¶ 14, 142 P.3d 701, 705 (App. 2006); *see also State v. Lowery*, 230 Ariz. 536, 540, ¶ 9, 287 P.3d 830, 834 (App. 2012) (recognizing that, if a defendant fails to object to an alleged error at trial, he must affirmatively show prejudice, not merely that the error may have contributed to the verdict).

¶28 In this case, the jury rejected Appellant's testimony, and it would be speculative and inconsistent to conclude the jury could have found the State proved beyond a reasonable doubt that Appellant was not justified in defending himself with the shovel against the victim's threatened use of the machete, *see* A.R.S. § 13-404, but could have nevertheless found the State failed to prove beyond a reasonable doubt that Appellant was not justified in striking the victim with the shovel to prevent a further aggravated assault or kidnapping. *See* A.R.S. § 13-411(A). Moreover, Appellant's testimony was internally inconsistent and failed to account for at least two to three hours from the time he was allegedly kidnapped until he struck the victim with the shovel. Finally, Appellant's testimony was controverted by his own actions (fleeing from Officer Werner), the testimony of the victim and the other witnesses, and the physical evidence (including that no weapons were found at the scene and the victim's numerous and severe injuries, despite Appellant's testimony that he only struck the victim once). The jury clearly rejected Appellant's testimony, and Appellant has not shown a reasonable probability the verdict might have been different had the trial court given a crime prevention justification instruction. Therefore, Appellant fails to carry his burden of proving he was prejudiced by the alleged error. *See Lowery*, 230

Ariz. at 540, ¶ 9, 287 P.3d at 834; *Munninger*, 213 Ariz. at 397–98, ¶¶ 14–15, 142 P.3d at 705–06.[11]

## CONCLUSION

**¶29**     The trial court did not commit fundamental, reversible error in not providing the jury with a crime prevention justification instruction. Appellant's conviction and sentence are affirmed.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama

---

[11]     Because we affirm on the aforementioned bases, we do not address the State's argument that the self-defense and crime prevention justification defenses are now coterminous by implication because residual distinctions between the defenses no longer exist.