Filed 8/30/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br>v.<br>ANSHEEL ANOSH KUMAR,<br>Defendant and Appellant. | A150107<br><br>(Solano County<br>Super. Ct. No. FCR306272) |

Ansheel Anosh Kumar (defendant) appeals from a judgment entered after a jury found him guilty of vehicular manslaughter with gross negligence (Pen. Code, § 192, subd. (c)(1))[1] and the trial court sentenced him to two years in prison. He contends the court prejudicially erred by giving "confusing and conflicting instructions" on the mental state required for the charged offense and lesser included offense and by failing to define "criminal negligence," a term the court used in those instructions. We reject his contentions and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On December 1, 2014, an information was filed charging defendant and codefendant Lawan Lee Harper with vehicular manslaughter with gross negligence (§ 192, subd. (c)(1)).

At about 7:00 p.m. on February 25, 2014, witness Thong V. was at a red light waiting to merge onto Air Base Parkway in Fairfield, California, when he saw a Nissan

---

[1] All further, undesignated statutory references are to the Penal Code.

and a Mitsubishi[2] stopped at the same light with their engines "revving."  When the light turned green, the Nissan's tires began spinning and the cars "took off," "speeding really fast"; it was "basically a race."

After Thong V. drove around a bend, he saw the headlights of a Cadillac that was stopped at a left-turn lane from which cars can make a left turn into a business known as Pick-n-Pull.  As the Cadillac, with its left-turn signal on, began to turn left at a "regular" turning speed of about 5 to 10 miles per hour, the brake lights lit up on the Nissan and Mitsubishi and there were braking sounds coming from those cars.  From about 20 feet away, Thong V. saw the Mitsubishi avoid hitting the Cadillac and the Nissan "T-bone[]" the Cadillac, sending the Cadillac 20 to 30 yards down the road.  The Nissan fell into a ditch.  Thong V. and others helped pull the driver of the Nissan—defendant—out of his car.  The Mitsubishi's driver, codefendant Harper, stopped and checked on the Nissan, stayed for a minute or two, then "took off."

Enrique V. also witnessed the Nissan and Mitsubishi racing when he was driving with his 19-year-old son Lucas V. as his passenger.  He saw the Nissan cut in front of the Mitsubishi and the cars "jockeying into position"; he said to his son, " 'They are going to race.' "  The cars were " 'aggressive and maneuvering around traffic' " and their engines were revving as they came to a stop at a red light.

As soon as the light turned green, the cars "haul[ed] butt" and drove off. Enrique V. lost sight of the cars but heard an impact.  As he continued to drive, "all you saw was smoke" and "debris up ahead."  He saw the Nissan "off the road," and he and his son went to aid the driver of the Cadillac.

Lucas V. also heard "revving" from the Nissan and Mitsubishi  and saw the cars drive off, rapidly accelerate, and "get[] further away from us" at about 80 to 85 miles per hour.  When Lucas V. and his father reached the next intersection, the two cars were

---

[2] Some witnesses, including Thong V., thought the second car was a Subaru because the Subaru WRX and Mitsubishi Lancer are "very similar."  To avoid confusion, we will refer to the second car as a Mitsubishi in this opinion.

stopped at another red light and there was "[m]ore revving coming from both cars." The Nissan began "jerking forward a little bit, almost like they do in . . . drag-racing style." When the light turned green, the two cars accelerated away at an estimated 90 to 95 miles per hour.

Lucas V. lost sight of the Mitsubishi and Nissan when the cars went around a curve. When his father also drove around that curve, Lucas V. saw glass and other debris in the road, the Nissan in a ditch, and a Cadillac stopped on the shoulder of the road. The "whole right side of the [Cadillac was] destroyed" to the point where "[t]he full right side of the car was in the center of the car basically." Lucas V. and his father assisted the driver of the Cadillac, Quincy Jones, who was bleeding and was "completely unconscious." Lucas V. squeezed Jones's hand and let him know that people were there to help, but there was no response. The parties stipulated that the driver of the Cadillac, "Quincy Jones[,] was killed [as a] result of blunt-force-chest injury due to the motor vehicle collision . . . ."

Witness Kenneth A., a long-time auto mechanic who used to work at a race track, was working on a truck by the Pick-n-Pull when he heard two cars accelerating. He looked up and saw the cars' headlights coming around the end of a curve of Air Base Parkway about 1,000 yards from where he stood. Based on what he saw, he assumed the cars were racing.

About 100 yards away, Kenneth A. saw the headlights of a Cadillac stopped in the left-turn lane, waiting to make a left turn. As he looked down for "a split second," Kenneth A. "heard a big, loud bang" and saw "the two cars sliding. And lights and glass and coolant going everywhere." He estimated the speeding cars were traveling "close to 130, 150" miles per hour, "right in that area. Way up there." He opined the cars were going at least 100 miles per hour based on his training and experience working with cars, the "full throttle" or "open throttle" noises he heard, the fact that the cars were "accelerating and moving at a much faster pace than regular, freeway traffic," and the fact that he heard the explosion in "a blink of the eye" as he looked away for "a split second . . . ."

3

Witness Kaiwanna A. was driving on Air Base Parkway at 45 to 50 miles per hour when the Nissan and Mitsubishi flew by him at a high rate of speed. He also testified that the cars were revving their engines and described how the cars drove off quickly and erratically as if "they were drag racing." He said he saw the Cadillac's headlights "as bright as day" before the Nissan hit the Cadillac.

Fairfield Police Officer Jimmie Williams was dispatched to the scene and saw debris, skid marks, and fluids on the road. The Cadillac was facing the wrong direction on the road, and the Nissan was down an embankment. The Cadillac had an intrusion into its passenger-side door, and there was "a portion of the car . . . in a place where it wouldn't normally be." The Nissan had extensive damage to its hood and front bumper: "[Y]ou couldn't make out the front of the car any longer. It would be as if you don't know what you were looking at." The Nissan had a rear bumper sticker on it that read "[d]emon racing."

After spending about an hour at the scene, Williams went to the hospital to interview defendant and recorded the interview. Defendant told Williams that he saw the Cadillac in the left-turn lane begin to turn, "kinda peek[ing] out to see if he could go." He hit his brakes when the Cadillac moved because he thought it was "gonna go all the way." When the Cadillac stopped again, defendant let go of his brakes and decided to keep driving. At that point, the Cadillac drove out onto Air Base Parkway at about two to four miles per hour and cleared one lane but wound up in front of defendant's car in the next lane. Defendant hit his brakes but was unable to stop in time. He said, "I mean, I seen the car, it's not, like I meant to hit it, you know." (*Sic.*)

Defendant did not know what the speed limit was on Air Base Parkway and said he "just go[es] with the flow of traffic all the time" and "never look[s] at the speed . . . ." He said he was "goin', like, 60-75" at the time of the collision, then said he did not think he was going 70 or 75 miles per hour. When asked whether he was going at a "reasonable" speed that night, defendant responded, "[N]ot after what happened."

Defendant said he did not know codefendant Harper and was not racing anyone. When Officer Williams told defendant that witnesses were saying he was racing,

4

defendant said this was not true and added, "My car was loud . . . . I have an exhaust, it looks like a race car. Anyone can assume anything." At the end of the interview, defendant said, "I know. I was wrong," and, "I know I wasn't doin' what I was supposed to be doin'. I was breaking the law . . . ."

Later that evening, Williams spoke with Harper and recorded the interview. Harper told Williams that he had been driving his Mitsubishi on Air Base Parkway at about 55 miles per hour that night and did not "fully" see the collision. He said that as he and the Nissan went past an intersection, he saw, "out of nowhere," the headlights of a stopped car that was about to turn.

The car turned, then stopped in the middle of the road as if the driver had changed his mind about turning. Harper drove around the car, but the Nissan hit the stopped car. Harper told Williams that he did not know defendant; he said that no one who saw him and defendant driving could have reasonably believed they were racing.

Officer Williams testified that he recognized Harper during the interview because one month before the incident he had given him a warning citation for traveling 68 miles per hour in his car on Air Base Parkway near the Pick-n-Pull. At that time, there were two other cars that were less than a car length away from each other, which concerned Williams because the three cars were speeding and because "driving close at any speed" is "unsafe . . . ." Williams pulled Harper over and explained to him the dangers of driving the way he was driving. Williams testified that Harper's Mitsubishi had a turbocharged engine, a modified exhaust system, and an aftermarket "blow-off valve" that helped the car make noise and helped its acceleration rate.

Retired police officer Robert Marin, who was qualified as a traffic collision reconstruction and vehicle mechanics and systems expert, testified that the Nissan, which was completely destroyed, had possible aftermarket components and modifications that are meant to increase performance, economy, and/or sound. The Cadillac, which ended up spun around on Air Base Parkway, 183 feet from the point of impact, also had extensive damage; in one part of the car there were just 18 inches between the passenger and driver's sides. Although both the Nissan and the Cadillac had an airbag control

5

module, the data was not retrievable.  The damage to the two cars was "the most egregious" damage Marin had seen on cars of similar size in his experience, which spanned thousands of collision investigations.

Marin used the "conservation of colinear momentum calculation" in determining that the minimum speed of the Nissan at the time it struck the Cadillac was 105 miles per hour.  This calculation method was the correct one to use in situations where the impacted car was at a stop when hit.  Marin believed, based on the evidence he had, including his evaluation of the departure and stopping points of the Nissan and Cadillac and his calculation of their departure speeds and trajectories, that the Cadillac was stopped in the number two lane when defendant struck it broadside.

Marin acknowledged that some witnesses had reported seeing the Cadillac moving at the time of impact and that the better calculation method to use when the vehicle is moving when struck is the "conservation of angular momentum."  Marin did not conduct a calculation using this method but estimated that if the Cadillac had been moving at two to four miles per hour when hit, it would have ended up in about the same place and defendant's speed would have been about 100 miles per hour at the time of impact.  He opined that if the Cadillac had been traveling at about 10 to 12 miles per hour when hit, the Nissan's minimum impact speed would have been about 93 to 95 miles per hour.  He believed, however, that if the Cadillac had been traveling at 10 to 12 miles per hour when hit, both cars would have ended up in different locations than they did.

The defense presented testimony from William Sommers, who was qualified as an expert in accident reconstruction and collision investigation.  Sommers testified that he found numerous problems in the police department's work and in Marin's report.  He testified, for example, that Marin used the wrong calculation method because the colinear momentum calculation should be used only in one-directional, centrally located collisions such as rear-end collisions.  Sommers opined, based on factors such as the areas of impact on the Nissan and Cadillac, witness statements, and the postimpact resting positions of the cars, that the Cadillac was moving at the time of impact.  Using the information he had, Sommers conducted his own calculation and estimated that defendant

6

was driving at about 65 miles per hour at impact and that the Cadillac was moving at about "six plus miles per hour."

The jury found both defendants guilty as charged, and the trial court sentenced each of them to the low term of two years in prison.

## DISCUSSION

Defendant contends the trial court prejudicially erred by giving "confusing and conflicting instructions" on the mental state required for the charged offense and lesser included offense and by failing to define "criminal negligence," a term the court used in those instructions. We reject his contentions.

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review." (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In reviewing a claim of instructional error, we "must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.) "What is crucial . . . is the meaning that the instructions communicated to the jury. If that meaning was not objectionable, the instructions cannot be deemed erroneous." (*People v. Benson* (1990) 52 Cal.3d 754, 801, italics omitted.)

" ' "[T]he correctness of jury instructions is to be determined from the entire charge of the [trial] court, not from a consideration of parts of an instruction or from a particular instruction." ' " (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248, second bracketed insertion added.) " ' "The absence of an essential element in one instruction," ' " for example, " ' "may be supplied by another or cured in light of the instructions as a whole." ' " (*People v. Bolin* (1998) 18 Cal.4th 297, 328.) We also "consider the arguments of [trial] counsel in assessing the probable impact of the instruction[s] on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) "Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions." (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.)

Here, as noted, defendant was charged with vehicular manslaughter with gross negligence, a felony that requires a finding of gross negligence. (§ 192, subd. (c)(1).)

Courts have used the terms "gross negligence" and "criminal negligence" interchangeably, and some cases hold the terms are synonymous. (E.g., *People v. Penny* (1955) 44 Cal.2d 861, 877–879; *People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1140–1141.) Gross negligence (or criminal negligence) occurs when a person commits an act that is "so different from how an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act." (CALCRIM No. 592.)

A necessarily lesser included offense is vehicular manslaughter with ordinary negligence, a misdemeanor that requires only a finding of ordinary negligence. (§ 192, subd. (c)(2).) Ordinary negligence is a lower standard of negligence that is distinct from either "criminal negligence" or "gross negligence." (*In re Dennis B*. (1976) 18 Cal.3d 687, 696.) "Ordinary negligence . . . is the failure to use reasonable care to prevent reasonably foreseeable harm to oneself or someone else. A person is negligent if he or she . . . does something that a reasonably careful person would not do in the same situation . . . ." (CALCRIM No. 593.)

As to these two crimes, the trial court correctly instructed the jury on the elements the prosecution was required to prove, including the required level of negligence for each offense: gross negligence for the charged felony offense (CALCRIM No. 592) and ordinary negligence for the lesser included misdemeanor offense (CALCRIM No. 593). As to the charged felony offense, the trial court instructed the jury with CALCRIM No. 592 as follows: "The defendants are charged with gross vehicular manslaughter. [¶] To prove that a defendant is guilty of gross vehicular manslaughter, the People must prove that: [¶] 1. The defendant drove a vehicle; [¶] 2. While driving that vehicle, the defendant committed a misdemeanor or infraction or an otherwise lawful act that might cause death; [¶] 3. The defendant committed the misdemeanor or infraction or an otherwise lawful act with gross negligence; [¶] AND [¶] 4. The defendant's grossly negligent conduct caused the death of another person. [¶] The People allege that the defendant committed the following misdemeanors: Reckless Driving, Speed Contest and/or Exhibition of Speed. Instructions 2200, 2201 and 2202 tell you what the People

8

must prove in order to prove that the defendant committed Reckless Driving, Speed Contest and/or Exhibition of Speed. [¶] Violation of the Basic Speed Law may be an infraction. See Special Instruction No. 1. [¶] *Gross negligence* involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with gross negligence when: [¶] 1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk. [¶] In other words, a person acts with gross negligence when the way he or she acts is so different from how an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act. [¶] *Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm."

As to the lesser included misdemeanor offense, the trial court instructed the jury with CALCRIM No. 593 as follows: "Vehicular manslaughter with ordinary negligence is a lesser crime than gross vehicular manslaughter. [¶] To prove that a defendant is guilty of vehicular manslaughter with ordinary negligence, the People must prove that: [¶] 1. While driving a vehicle, the defendant committed a misdemeanor or infraction or a lawful act in an unlawful manner; [¶] 2. The misdemeanor, infraction or otherwise lawful act was dangerous to human life under the circumstances of its commission; [¶] 3. The defendant committed the misdemeanor, infraction or otherwise lawful act with ordinary negligence; [¶] AND [¶] 4. The misdemeanor, infraction or otherwise lawful act caused the death of another person. [¶] The People allege that the defendant committed the following misdemeanors: Reckless Driving, Speed Contest and/or Exhibition of Speed. Instructions 2200, 2201 and 2202 tell you what the People must prove in order to prove that the defendant committed Reckless Driving, Speed Contest and/or Exhibition of Speed. [¶] Violation of the Basic Speed Law may be an infraction. See Special Instruction No. 1. [¶] The difference between this offense and the charged offense of gross vehicular manslaughter is the degree of negligence required. I have already defined gross negligence for you. [¶] *Ordinary negligence*, on the other hand, is the failure to use

9

reasonable care to prevent reasonably foreseeable harm to oneself or someone else. A person is negligent if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation."

However, in two other jury instructions—CALCRIM Nos. 253 and 3404, the trial court used the term "criminal negligence" as a catch-all term that encompassed both gross negligence and ordinary negligence, even though, as noted, cases have held that "criminal negligence" is the equivalent of "gross negligence," and "ordinary negligence" is distinct from "criminal negligence" and "gross negligence." It appears the court was unaware of cases equating "criminal negligence" with "gross negligence"; it stated at a hearing during which the parties were discussing jury instructions that "the mens rea necessary is criminal negligence. [¶] And, of course, criminal negligence has both categories of gross negligence and ordinary negligence. . . ."

Accordingly, the trial court used the term "criminal negligence" as encompassing both gross and ordinary negligence when it instructed the jury with CALCRIM No. 253 as follows: "For you to find a person guilty of the crimes of Vehicular Manslaughter with Gross Negligence and Vehicular Manslaughter with Ordinary Negligence, a person must do an act with criminal negligence. Criminal negligence is defined in the instructions on that crime." Similarly, the court instructed the jury with CALCRIM No. 3404 as follows: "The defendants are not guilty of Vehicular Manslaughter with Gross Negligence or Vehicular Manslaughter with Ordinary Negligence if they acted accidentally without criminal negligence. You may not find a defendant guilty of Vehicular Manslaughter with Gross Negligence or Vehicular Manslaughter with Ordinary Negligence unless you are convinced beyond a reasonable doubt that he acted with criminal negligence. Criminal negligence is defined in another instruction."

Defendant asserts that instead of using the term "criminal negligence" (which means "gross negligence") in those instructions, the trial court should have used the term "gross negligence" for the charged felony offense and "ordinary negligence" for the lesser included misdemeanor offense. Defendant also complains that the court never

10

defined the term "criminal negligence" even though CALCRIM Nos. 253 and 3404 stated the term would be defined in other instructions.

We agree the trial court should have used the terms "gross negligence" and "ordinary negligence" instead of introducing the term "criminal negligence" in CALCRIM Nos. 253 and 3404 without defining it. (See *People v. Nicolas* (2017) 8 Cal.App.5th 1165, 1175 [Attorney General conceded it was error for the trial court to use the term "criminal negligence" in CALCRIM Nos. 253 and 3404 without defining the term].) We conclude, however, that any error in using the term "criminal negligence" in CALCRIM Nos. 253 and 3404 was harmless. (See *People v. Moye* (2009) 47 Cal.4th 537, 541 [applying harmless error analysis of *People v. Watson* (1956) 46 Cal.2d 818, 836 to instructional error]; *People v. Smithey* (1999) 20 Cal.4th 936, 963–964 [reversal is not required unless it is reasonably likely the jury misunderstood and misapplied the instructions to the defendant's detriment].)

Here, taken together, the instructions conveyed the correct mental state for the crime. As noted, the trial court instructed the jury with CALCRIM Nos. 592 and 593, which set forth the elements the prosecution was required to prove for the charged offense and the lesser included offense. Those instructions made it clear to the jury that "gross negligence" was required for a conviction on the charged offense and that "ordinary negligence" was required for a conviction on the lesser included offense. Although CALCRIM Nos. 253 and 3404 did not define the term "criminal negligence," CALCRIM No. 253 stated, "Criminal negligence is defined in the instructions on that crime," thereby referring the jury to CALCRIM Nos. 592 and 593, which correctly defined the levels of negligence required for each offense. Given those instructions, the jury would have understood the reference to "criminal negligence" to mean "gross negligence" in the context of the charged felony offense and "ordinary negligence" in the context of the lesser included misdemeanor offense.

The arguments of counsel also helped the jury understand the two distinct levels of negligence. The prosecutor told the jury during closing argument that there are "different kinds of negligence," that the "lesser included in this case . . . is ordinary negligence,"

11

and that "gross negligence is a greater form." The prosecutor urged the jury to find defendant guilty of "gross vehicular manslaughter" and argued that the "lesser include[d], the ordinary negligence, that is much lesser degree."

Defense counsel's closing argument also assisted the jury. Counsel stated: "Now, what you have to decide is whether there is criminal negligence or not. That is the first decision you have to come to. Um, and you base that on whether you think Mr. Kumar is criminally liable in this chase [*sic*]. And there [is] gross negligence and ordinary negligence." Defense counsel also argued this case "doesn't support gross negligence" because defendant did not "completely, totally disregard [a] warning" by, for example, "barreling down and . . . cross[ing] through that red light and . . . smash[ing] into someone else. That is gross negligence." Defense counsel gave another example, stating it would be gross negligence to wave a loaded gun at people. Counsel then argued, "[W]e know it is not gross negligence to go 60, 65, 70 miles per hour on Air Base Parkway because a lot of people do it."

Defense counsel then stated that defendant's act could, at most, constitute "ordinary negligence . . . [which] is the failure to use reasonable care to prevent reasonably foreseeable harm to oneself or someone else. A person is negligent if he or she does something that a careful person would not do in the same situation or fail [*sic*] to do something that a reasonably careful person would do in the same situation." "By the prosecution's logic, if I speed, I am grossly negligent. That is not the case. Reasonable careful people speed all the time. . . . Doesn't mean they know that if you . . . go over the speed limit they are going to kill somebody or they are going to cause great bodily harm to someone. Nobody expects that."

In rebuttal, the prosecutor reiterated that the case involved two types of negligence, stating: "And as far as the two forms of negligence go, so there is ordinary negligence. So that was talked about. That is simply the failure to use reasonable care to prevent reasonably foreseeable harm to oneself or someone else versus acting in a reckless way that creates a high risk of death or great bodily injury." The prosecutor then argued that defendant's behavior was not "ordinary negligence versus gross negligence"

12

because defendant and Harper "were racing[,] cause[d] great property damage and actually took somebody's life based on the speed they [were] driving and based on the negligence of racing each other."

Given the jury instructions as a whole and the fact that the arguments of counsel correctly informed the jury regarding the elements of the crime and the two distinct levels of negligence, it is not reasonably probable the jury interpreted CALCRIM Nos. 253 and 3404 to mean it could substitute its own definition of "criminal negligence" or use a lower standard of negligence than "gross negligence" to convict defendant of the charged felony offense. "Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting." (*Boyde v. California* (1990) 494 U.S. 370, 380–381.) We are satisfied that the jury understood that before it could convict defendant of gross vehicular manslaughter, it had to find, beyond a reasonable doubt, that he acted with gross negligence. Accordingly, any error in using the term "criminal negligence" and/or failing to define the term was harmless.

Finally, defendant notes that constitutional error occurs when jury instructions lead to confusion on the mental state required for conviction or lighten the prosecution's burden of proof on an essential element of the charged offense. In light of our conclusion that the instructions did not confuse or mislead the jury regarding the mental state or burden of proof, we also reject any claim of constitutional error.

## DISPOSITION

The judgment is affirmed.

_____
Wick, J.*

WE CONCUR:


_____
Siggins, P. J.


_____
Fujisaki, J.

A150107/*People v. Kumar*

_____

* Judge of the Superior Court of Sonoma County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A150107/People v. Kumar

Trial Court:  Superior Court of Solano County

Trial Judge:  Wendy G. Getty, J.

Counsel:      Law Office of Victor Blumenkrantz and Victor Blumenkrantz for Defendant and Appellant.

            Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, René A. Chacón and Bruce Ortega, Deputy Attorneys General, for Plaintiff and Respondent.